**NEW YORK RACING ASSOCIATION, INC., Plaintiff,**

v.

**STROUP NEWS AGENCY CORPORATION, Defendant.**

No. 94–CV–1042.

United States District Court, N.D. New York.

March 14, 1996.

Rice & Justice, Albany, New York (Brad-
ley F. Rice, of counsel), Robin, Blecker, Da-

ley & Driscoll, New York City (Howard B. Barnaby, of counsel), for Plaintiff.

Hogan & Hogan, Saratoga Springs, New York (John M. Hogan, Jr., of counsel), for Defendant.

### MEMORANDUM, DECISION, and ORDER

McAVOY, Chief Judge.

Plaintiff New York Racing Association ("NYRA") brought suit against defendant Stroup News Agency Corporation ("Stroup"), alleging violations of federal trademark law and state trademark and unfair competition laws, and seeking damages, an accounting, costs, and attorneys' fees. After oral argument on June 23, 1995, the Court granted NYRA's motion for summary judgment on the issue of whether Stroup's T-shirt, bearing the legend "SARATOGA," accompanied by a picture of racing thoroughbreds, infringed upon NYRA's trade and service marks and constituted unfair competition. Having determined Stroup's liability, the Court held a bench trial on September 7, 1995, to determine damages.

### Findings of Fact

1. NYRA operates Saratoga Race Course, which opened in Saratoga Springs in 1863. It holds two registered service marks: a) *"SARATOGA"* and b) a logo consisting of *"SARATOGA"* with an umbrella over the letters "O" and "G" and a race horse across those letters. NYRA also holds a trademark in the phrase *"SARATOGA RACE-COURSE."*

2. NYRA licenses others to manufacture and sell various souvenir items—such as clothing, hats, and glasses—bearing these marks. Licensees sell this merchandise at the Race Course and elsewhere.

3. Since 1992, NYRA's master licensee has been David D. Barker, Inc. ("Barker"). (Tr. at 20.) With NYRA's approval, Barker grants various sublicenses to companies who desire to sell Saratoga souvenir merchandise outside the track.

4. NYRA requires authorized licensees to affix a sticker to their products identifying them as official, NYRA-approved merchandise.

5. Between 1990 and 1994, NYRA allegedly grossed $2,700,000 from its licensing program. (Lieberman Aff. ¶ 8.)

6. On July 13, 1992, Barker granted Stroup a sublicense to make and sell products imprinted with the *"SARATOGA"* and *"SARATOGA RACECOURSE"* marks at Stroup's stand outside the track and at Stroup's Mainstreet News Store in Saratoga Springs. (Tr. at 21.)

7. The sublicense agreement required Stroup to affix the official NYRA sticker to its merchandise. (*Id.*)

8. As part of this agreement, Stroup acknowledged NYRA's rights in the marks, agreed to refrain from using NYRA's marks after the expiration of the license, and agreed to injunctive relief as a remedy for any such use. (P's Ex. 8, ¶¶ 8, 13.)

9. The agreement also provided for a ninety-day post-expiration period during which Stroup could dispose of on-hand products without incurring liability. (P's Ex. 8, ¶ 12.) The provision reads, in its entirety, as follows:

> *Disposal of Stock.* After expiration or termination of this Sublicense, Sublicensee shall have no further right to manufacture, advertise, distribute, sell or otherwise deal in any Licensed Products or other products which utilize the NYRA Marks except as hereinafter provided. Sublicensee may dispose of Licensed Products which are on hand or in process at the time of such expiration or termination for a period of ninety (90) days thereafter, provided all statements and payment then due are first made.

10. Pursuant to the Sublicense agreement, Stroup offered for sale a T-shirt displaying the word "SARATOGA" together with a picture of thoroughbred horses ["*SARATOGA*' T-shirts"]. (Barker Aff. ¶ 12.) Stroup sold the shirts for $12.99 each. (Tr. at 36.)

11. Stroup paid Barker an "up-front" royalty of fifteen per cent. (P's Ex. 8, ¶ 4(B); Tr. at 23.) The sublicense agreement also provided that Stroup would pay a royalty of

fifteen per cent on all net sales of licensed products sold during the contract period. (P's Ex. 8, ¶ 4(A).)

12. The sublicense agreement between Barker and Stroup expired on December 31, 1992. (Tr. at 22.) Barker denied Stroup's request for a new license in 1993. Stroup did not seek a license in 1994.

13. From March, 1993, through June, 1995, Deborah Lee managed two Stroup stores in Saratoga Springs, New York. One store was located at 382 Broadway and the other was located at 517 Broadway. (Tr. at 33–34.) As the manager of these stores, Ms. Lee was in charge of ordering, basic accounting, billings, and weekly reconciliations, *inter alia*. (Tr. at 33.)

14. In March, 1993, each of Stroup's Broadway stores offered for sale approximately two dozen *"SARATOGA"* T-shirts at the price of $12.99 each. (Tr. at 35–36.) In addition, the 382 Broadway store had a case of 72 *"SARATOGA"* T-shirts in its basement. (Tr. at 36–37.)

15. The 382 Broadway store received another case of 72 *"SARATOGA"* T-shirts before the commencement of 1993 racing season. (*Id.* at 36–37.) These shirts arrived without the official NYRA sticker on them. (Tr. at 40.) The packing slip in the box indicated that a company called Broadway Marketing had shipped the shirts. (*Id.* at 39.)

16. In July, 1994, each of Stroup's Broadway stores received one box of 60 *"SARATOGA"* T-shirts. These shirts also arrived without the official NYRA sticker on them. (Tr. at 40.) The packing slips in these boxes did not indicate who had shipped the shirts. (*Id.* at 39–40.)

17. In Stroup's response to NYRA's statement of undisputed material facts, Stroup admitted that in 1994, more than a year after the expiration of the sublicense agreement, it sold "left over" T-shirts that were identical to those it had sold pursuant to the sublicense agreement. (Dkt. # 16, ¶¶ 13, 17.)

18. Robert Rubin is one of Stroup's principals. (Tr. at 27–28.)

19. At some time during her employment, Ms. Lee heard Mr. Rubin order certain stickers over the telephone. (Tr. at 40–41.)

20. These stickers differed from the official sticker that NYRA used to designate its licensed products in 1992. (Tr. at 41.) Whereas the 1992 sticker indicated "Broadway Marketing" along the bottom, the stickers Ms. Lee received in 1993 and 1994, although nearly identical to the 1992 stickers, indicated "Mainstreet News" along the bottom. (Tr. at 41; P's Ex. 10.)

21. Mr. Rubin instructed Ms. Lee to affix the "Mainstreet News" stickers to the stickerless T-shirts that the Broadway stores received in 1993 and 1994. (Tr. at 40–41.)

22. In the Spring of 1994, master-licensee Barker discovered that Stroup had begun operating gift shops in the rest stops along the New York State Thruway and at the Albany Airport. (Tr. at 23–24.)

23. Barker later observed unauthorized *"SARATOGA"* T-shirts offered for sale at Stroup's Mainstreet New Store, a Thruway shop, and the Albany Airport shop. (Tr. at 24–26; P's Ex. 9.)

24. These shirts bore stickers different from the official NYRA sticker. (Tr. at 26–27.)

25. Barker called Stroup's owner, Robert Rubin, and told him that the shirts in his store were not authorized for sale. (Tr. at 28–29; Barker Aff. ¶¶ 16–17.)

26. Despite an assertion to the contrary in the affidavit of Michael O'Leary, the Secretary of Stroup, the Court finds that Dave Barker never told any Stroup employee that Stroup could continue to sell unlicensed *"SARATOGA"* T-shirts beyond the 90–day disposal-of-inventory provision in the sublicense agreement. (O'Leary Aff. ¶¶ 2–3; Tr. at 29–31.) Unlike Mr. O'Leary, Mr. Barker testified at trial and answered questions on cross-examination. Furthermore, even if, as Mr. O'Leary claims, Mr. Barker told a Stroup employee in 1994 that Stroup could continue to sell old inventory (O'Leary Aff. ¶¶ 2–3), Mr. O'Leary never specified **when in** 1994 Mr. Barker allegedly conveyed such information. If Mr. Barker made such a statement in January, February, or March of

that year, then he simply informed the Stroup employee of what the sublicense agreement permitted—Stroup's disposal of unused inventory for 90 days after the expiration of the sublicense agreement.

27. Stroup nevertheless continued to sell the unofficial T-shirts, without paying further royalties to NYRA. (Tr. at 29.)

28. Mr. Rubin had personal knowledge that Stroup sold T-shirts with NYRA's mark on them in 1993 and 1994. In addition to Mr. Barker's informing him of this fact, Mr. Rubin "sent the shirts to the store" and "he would come into the store and make sure that they were displayed." (*Id.* at 40.)

29. At trial, Stroup failed to produce testimonial or any other kind of evidence. It follows that Stroup failed to present any evidence of sales, costs or deductions. In response to NYRA's requests for documents, Stroup stated that there are no documents relating to its wholesale or retail sales of T-shirts with NYRA's marks on them.[1] (*See* P's Ex. 12, ¶¶ 8–9.)

30. Stroup has failed to present evidence that any of the T-shirts mentioned paragraphs 14–16 were covered by the disposal-of-stock provision in the sublicense provision. Nor did Stroup present evidence that it sold fewer than all of these T-shirts.

31. The Court thus finds that in 1993, Stroup sold the 48 *"SARATOGA"* T-shirts from its Broadway stores' racks, the 72 *"SARATOGA"* T-shirts from the basement of its 382 Broadway Store, and the 72 additional *"SARATOGA"* T-shirts that the 382 Broadway store received before the commencement of 1993 racing season, for a total of 192 sales.

32. In 1994, Stroup sold infringing *"SARATOGA"* T-shirts from at least five locations: the Mainstreet News Store, one of the Thruway stores, the Albany Airport Gift Shop, the 382 Broadway Store, and the 517 Broadway Store. At each location, Stroup displayed two dozen infringing *"SARATOGA"* T-shirts. In addition, each of the Broadway Stores received one case of 60 *"SARATOGA"* T-shirts in 1994.

33. Stroup has not offered evidence that any of the *"SARATOGA"* T-shirts it offered for sale in 1994 had been in inventory in 1993. It is reasonable to assume that when Stroup ordered new T-shirts for its two Broadway stores in 1994, it ordered them for the Mainstreet News, Thruway, and Airport shops as well. Mindful of the risk of double-counting, however, the Court infers that the 24 *"SARATOGA"* T-shirts displayed on the racks of each of its two Broadway stores in 1994 had been in those stores' inventories in 1993. Therefore, the Court finds that Stroup sold an additional 192 infringing *"SARATOGA"* T-shirts in 1994 (that is, 24 from each of three stores plus the 120 new *"SARATOGA"* T-shirts that the Broadway stores received in 1994).

34. From 1993 to 1994, then, Stroup sold approximately 384 infringing *"SARATOGA"* T-shirts at a price of $12.99 each. Therefore, its gross proceeds from the sale of these shirts were roughly $4988.16.

35. At trial, Stroup neither impeached the credibility of, nor controverted the testimony of, NYRA's three witnesses: David D. Barker, Deborah L. Lee, and John L. Russo.

## Conclusions of Law

1. NYRA seeks damages, an accounting, costs, and attorneys' fees from Stroup for violating NYRA's mark. To determine how much NYRA may recover from Stroup, the Court must consider both the Lanham Act and New York's law of unfair competition.

### I.  Lanham Act

2. Having already determined that Stroup violated the Lanham Act by infringing NYRA's mark and falsely designating the origin of Stroup's T-shirts, the Court turns to § 35(a) [§ 1117(a)] of that Act to establish how much NYRA is entitled to recover. Section 35(a) provides that a plaintiff may recov-

---

1. The Court finds this contention particularly dubious in light of paragraph 4(C) of the sublicense agreement, which calls upon Stroup to "submit monthly sales reports for sales of all Licensed Products ... within twenty (20) days following the conclusion of each month[]" or incur additional charges.

er from an infringing defendant[2] the defendant's profits and the plaintiff's damages, costs, and—in exceptional cases—reasonable attorneys' fees.

## A. Monetary Relief

■ 3. As a prerequisite to recovering profits and damages, the Second Circuit requires a trademark infringement plaintiff to establish that the defendant's infringing conduct caused actual consumer confusion or deception. *PPX Enter., Inc. v. Audiofidelity Enter., Inc.*, 818 F.2d 266, 271 (2d Cir.1987); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir.1980), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

■ 4. In some circumstances, however, the Court may infer actual consumer confusion. The plaintiff need not "provide evidence of actual consumer confusion by resort to witness testimony, consumer surveys, or other such evidence in order to establish entitlement to damages under the Lanham Act[,]" *PPX*, 818 F.2d at 273, if it "adequately demonstrates that a defendant has intentionally set out to deceive the public." *Resource Dev., Inc. v. Statue of Liberty–Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir.1991); *see also Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 656 (2d Cir.1989) "[U]pon a proper showing of ... deliberate conduct, the burden shifts to the defendant to demonstrate the absence of consumer confusion." *Resource*, 926 F.2d at 140.

■ 5. NYRA has carried its burden to show that Stroup intended to deceive its customers. When Stroup sold "*SARATOGA*" T-shirts in 1993 and 1994, after the sublicense agreement expired, it affixed to them counterfeit stickers almost identical to the official NYRA sticker that NYRA required all of its licensees to affix to the merchandise they sold pursuit to sublicense agreements. Indeed, the T-shirts Stroup sold in 1992 pursuant to its sublicense agree-

ment with Barker had official NYRA stickers affixed to them. By affixing the phony stickers to its "*SARATOGA*" T-shirts in 1993 and 1994, Stroup deliberately attempted to deceive consumers with the misrepresentation that its unofficial and unlicensed T-shirts were in reality official and licensed T-shirts, just like those Stroup sold in 1992. The Court infers from Stroup's deliberate attempt to deceive consumers that its infringing conduct caused actual consumer confusion.

6. Stroup has failed to present any evidence that might demonstrate the absence of consumer confusion.

7. Therefore, NYRA is entitled to monetary relief under § 35(a) of the Lanham Act.

### 1. Stroup's Profits

■ 8. The Lanham Act provides that NYRA is entitled to recover, subject to equitable principles, the profits Stroup earned from sales of its infringing T-shirts. In order to recover Stroup's profits, NYRA need not establish the actual quantum of damages Stroup caused. *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir.1985). Rather, "[i]n assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). The chief rationale behind the profits remedy explains the rule: "It is essential to deter companies from willfully infringing a competitor's mark, and the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose *all* profits from its use of the infringing mark." *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir.1970) (citing *Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.*, 349 F.2d 389, 396–97 (2d Cir.1965), *cert. denied*, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966); *see also George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir.) (holding that under 15 U.S.C. § 1117(a), "a plaintiff must prove that an infringer acted with will-

---

**2.** Whether the defendant infringed the plaintiff's trademark or service mark is irrelevant to the determination of this issue. "[S]ervice marks shall be registerable ... with the same effect as are trade-marks ... and shall be entitled to the protection provided [in this chapter] in the case of trademarks." 15 U.S.C. § 1053. *See also University of Pittsburgh v. Champion Prods., Inc.*, 686 F.2d 1040, 1049 (3d Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982).

ful deception before the infringer's profits are recoverable by way of an accounting."), *cert. denied,* 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992).

9. The record is replete with evidence that Stroup infringed NYRA's mark with willful deception. (Findings of Fact ¶¶ 8, 17–21, 23–28.)

■ 10. When parties in a trademark infringement case present the Court with incomplete evidence of sales of infringing goods, the Court "may justifiably rely on circumstantial evidence involving the extent of an infringer's wrongdoing." *Gucci America Inc. v. Rebecca Gold Enterprises, Inc.,* 798 F.Supp. 177, 182 (S.D.N.Y.1992) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931)) ("[I]t will be enough if the evidence show [sic] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."); *Louis Vuitton, S.A. v. Spencer Handbags Corp.,* 765 F.2d 966, 973 (2d Cir. 1985); *Deering Milliken & Co. v. Gilbert,* 269 F.2d 191, 193 (2d Cir.1959) ("[W]here ... the defendant controls the most satisfactory evidence of sales the plaintiff needs only establish a basis for a reasoned conclusion as to the extent of injury caused by the deliberate and wrongful infringement."). In the case at bar, the Court must draw inferences from the available circumstantial evidence to approximate Stroup's profits from its infringing activities.

■ 11. Applying this method, the Court has determined that Stroup sold approximately 384 infringing *"SARATOGA"* T-shirts, at a price of $12.99 each, generating gross proceeds of roughly $4988.16.

■ 12. Stroup has failed to present any evidence of costs or deductions. "Ordinarily, a plaintiff that has proved the amount infringing sales would be entitled to that amount unless the defendant adequately proved the amount of costs to be deducted from it." *American Honda Motor Co. v. Two Wheel Corp.,* 918 F.2d 1060, 1063 (2d Cir.1990); *see also M.B.S. Love Unltd. Inc. v. Park's Sportswear Corp.,* 19 U.S.P.Q.2d 1311, 1313, 1990 WL 276561 (S.D.N.Y.1991).

Thus, when a trademark plaintiff offers evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence as to the costs of goods sold, then the profits to which the plaintiff is entitled under the Lanham Act are equal to the infringer's gross sales. NYRA is therefore entitled to $4988.16 from Stroup as the amount of Stroup's profits from sales of infringing T-shirts.

■ 13. Title 15 U.S.C. § 1117(a) provides, in relevant part, that "If the court shall find that the amount of recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." The Second Circuit defined the boundaries of this and similar Lanham Act provisions in *Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103 (2d Cir. 1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Although this section of the Lanham Act does not permit courts to impose additional damages on trademark infringers for punitive purposes, the Second Circuit held, courts may increase a plaintiff's award for compensatory purposes, "even though the award is designed to deter wrongful conduct[.]" *Id.* at 113.

14. The Court cannot compute the value of the intangible benefits Stroup received as a result of its deliberate, flagrant, and mulish violation of NYRA's mark. For instance, Stroup may well have drawn additional customers into its stores by holding itself out as a purveyor of official Saratoga merchandise and sold those customers merchandise, in addition to T-shirts, that it would not otherwise have sold to them, and Stroup may have avoided the transactions and other costs associated with renewing its sublicense with Barker. In order to compensate NYRA for the intangible benefits Stroup earned at NYRA's expense, the Court will treble the profits award to $14,964.48. *See Deering,* 269 F.2d at 194 (expressing approval, in theory, of trebling defendant's profits "[e]specially in view of the deliberate and fraudulent nature of the infringement", but treating district court's award as based on plaintiff's damages).

## 2. NYRA's Damages

■ 15. One way courts measure how much damage a defendant has caused a plaintiff by infringing the plaintiff's mark is by determining what royalty the plaintiff would have received for a license. *See, e.g., Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1564–65 (11th Cir.1986) (stating that franchisor is entitled to recover damages in form of lost royalties for period during which hold-over terminated licensee used mark in location where franchise could have operated and generated royalties); *Deering,* 269 F.2d at 194–95 (computing plaintiff's actual damages by assessing defendant's profits, as "measured by plaintiff's minimum license fee which the defendant by its infringement had 'saved.' ").

■ 16. There is clear evidence in this case of the amount Stroup would have paid NYRA for a license to sell *"SARATOGA"* T-shirts. When Stroup and Barker entered their sublicense agreement in 1992, Stroup agreed to pay a fifteen per cent royalty on net sales. (Findings of Fact ¶ 11.) In the absence of evidence to the contrary, the Court infers that had Barker and Stroup reached sublicense agreements in 1993 and 1994, the royalty provision would have been the same.

17. Therefore, in 1993 and 1994, Stroup's unlicensed sales of infringing *"SARATOGA"* T-shirts deprived NYRA of its fifteen per cent royalty. This is the amount that NYRA could have earned if a properly licensed business had sold non-infringing *"SARATOGA"* T-shirts at Stroup's locations.

18. Stroup must thus compensate NYRA for its lost profits by paying NYRA an amount equal to fifteen per cent of Stroup's gross sales of infringing T-shirts in 1993 and 1994. Fifteen percent of $4988.16 is $748.22.

19. The Lanham Act provides that "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a). *See also Pastificio Spiga Societa Per Azioni v. De Martini Macaroni Co.,* 200 F.2d 325, 327 (2d Cir.1952) (stating that Lanham Act gives trial court discretion to treble proven damages).

20. For the following two reasons, a simple lost profits award would insufficiently compensate NYRA for the damage Stroup's infringing conduct caused.

21. First, for every unlicensed *"SARATOGA"* T-shirt a customer purchases, licensed sellers of *"SARATOGA"* T-shirts presumably lose one sale, which ultimately reduces NYRA's revenues. Increasing NYRA's damage award would help compensate for these lost revenues.

22. Second, when Stroup affixed forged stickers to its *"SARATOGA"* T-shirts it misrepresented to its customers that NYRA vouched for the quality of the T-shirts and for the manner in which Stroup sold them. (Tr. at 11.) If Stroup's infringing T-shirts fell apart, or the printing on them faded, after the first wash, then its customers would blame NYRA, at least in part, for marketing defective goods. Similarly, if a customer received poor service from Stroup when attempting to buy or return a *"SARATOGA"* T-shirt, the customer would likely hold NYRA responsible for failing to oversee its licensees properly. Increasing NYRA's damages award would help compensate NYRA for any damage to its reputation or image that Stroup's sales of infringing T-shirts might have caused.

23. In light of the inadequacy of a simple lost profits recovery as compensation for the damage Stroup's trademark violations caused NYRA, the Court will treble NYRA's award for actual injuries to $2244.66. *Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103, 113 (2d Cir.1988) (holding that § 35 of Lanham Act authorizes an additional damage award, "so long as its purpose is to compensate a plaintiff for its actual injuries—even though the award is designed to deter wrongful conduct . . ."); *Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1563, 1566–67 (11th Cir.1986) (upholding district court's award of treble damages, in case where terminated franchisee held over and infringed plaintiff's mark, which damage award the court had based upon plaintiff's lost franchise fees and expenditures necessary for attracting new franchisee).

24. Although the Second Circuit has interpreted § 35 of the Lanham Act as permitting courts to increase a damages award only for remedial purposes, *see Getty,* 858 F.2d at 113, the Court pauses here to note two supporting rationales for trebling NYRA's damages award.

25. First, increasing NYRA's damages award may have a useful deterrent effect. Forcing Stroup to pay the royalty it would have had to pay had it executed sublicense agreements with Barker in 1993 and 1994 would do little to deter Stroup from infringing trademarks in the future. Given the choice between entering a sublicense agreement requiring a defendant to pay a fifteen per cent royalty on sales of trademarked goods and selling those goods without a license, but with the prospect of paying a fifteen per cent royalty if caught and held liable for infringement, an economically rational trademark infringer might well chose the latter course of action. *See Playboy Enterprises, Inc. v. Baccarat Clothing Co.,* 692 F.2d 1272, 1274–75 (9th Cir.1982).

26. Second, Stroup "utter[ly] fail[ed] to raise a single meaningful argument contravening [NYRA's] rights in [its] mark" (Oral Arg.Trans. at 13–14), or evidence that Stroup infringed NYRA's marks willfully and continuously. *See Gorenstein Enter., Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431 (7th Cir. 1989) (stating that infringer's arguments were so weak and its infringement so deliberate that trial judge would have abused discretion by **failing** to award plaintiff treble damages, attorney fees, and prejudgment interest).

## B. Costs

■ 27. Section 35(a) of the Lanham Act provides, in relevant part, that a plaintiff who establishes a violation of rights protected by the Act is entitled to recover from the defendant the costs of the action.

28. Having established that Stroup infringed its mark in violation of the Lanham Act, NYRA is entitled to recover from Stroup the costs it has incurred in connection with this action.

29. In order to recover its costs, NYRA must comply with the provisions of Local Rule 54.1(a).

## C. Attorney Fees

■ 30. Section 35(a) of the Lanham Act provides, in relevant part, that "The court in exceptional cases may award reasonable attorney fees to the prevailing party." The Second Circuit noted in *Centaur Communications. Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1229 (2d Cir.1987), that "deliberate and willful infringement can render a case 'exceptional' and thus support an award of attorneys' fees." *See also Quaker State Oil Ref. Corp. v. Kooltone, Inc.,* 649 F.2d 94, 95 (2d Cir.1981) (per curiam).

31. The *Centaur* court went on to note that "although [the defendant] claims that it reasonably doubted the validity of Centaur's trademark, it failed to point to any investigation it [violated Centaur's trademark]." Similarly, despite Stroup's assertion that it sold unlicensed *"SARATOGA"* T-shirts beyond the 90–day period for disposal of stock provided for in the sublicense agreement, only after investigating the propriety of doing so, Stroup's "utter failure to raise a single meaningful argument contravening plaintiff's rights in the mark" strongly suggests that such an investigation never occurred. (Oral Arg.Tr. at 13–14.) What is more, when it entered the sublicense agreement, Stroup acknowledged "that all trademark rights to the name NYRA and such NYRA marks and designs as may arise ... are wholly owned by NYRA, and all use of the NYRA marks shall inure to the benefit of NYRA." (Pl.s' Ex. 8 at ¶ 7.) Stroup also promised, "[a]fter expiration .. of this Sublicense ... to refrain from further use of the NYRA Marks ... except as provided in [the disposal of stock provision]" and "recognize[d] that irreparable injury would be caused by unauthorized use [of NYRA's mark]." (*Id.* at ¶ 13.)

32. The abundance of evidence that Stroup deliberately and willfully infringed NYRA's mark, and the lack of any credible evidence to the contrary, places this matter in the "exceptional case" category and amply justifies an award to NYRA of its attorneys' fees.

33. Therefore, the Court will direct both parties to file with this Court affidavits and briefs setting forth the amount of attorneys' fees NYRA is entitled to recover in connection with this matter. The Court refers the attorneys to *Donnell v. United States*, 682 F.2d 240, 251 (2d Cir.1982), *cert. denied*, 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983), which instructs the Court "to determine only the prevailing market rate within its jurisdiction".

## II. New York's Unfair Competition Law

■ 34. "[T]he law of trademarks is a part of the larger field of unfair competition." *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 497 n. 1 (2d Cir.1962) (citing *Dell Pub. Co. v. Stanley Publications, Inc.*, 9 N.Y.2d 126, 211 N.Y.S.2d 393, 172 N.E.2d 656 (N.Y.1961)). As Judge Learned Hand wrote almost seventy years ago, the key principle underlying the intersection between the law of unfair competition and the law of trademarks is the avoidance of consumer confusion: "one merchant shall not divert customers from another by representing what he sells as emanating from the second." *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 973 (2d Cir.1928). Generally, when a defendant represents its merchandise as "emanating" from the plaintiff, the "conduct that constitutes trademark infringement also constitutes unfair competition in violation of New York law." *Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 655 (2d Cir.1989); *see also Safeway*, 307 F.2d at 497 n. 1; *Dell*, 211 N.Y.S.2d at 398.

■ 35. Under New York law, a plaintiff in an unfair competition case can recover punitive damages if the "defendant's conduct has constituted 'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree." *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 371 (2d Cir. 1988) (quoting *Borkowski v. Borkowski*, 39 N.Y.2d 982, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287 (N.Y.1976)); *see also Getty*, 878 F.2d at 657. In *Getty*, the court found the standard for punitive damages satisfied where the defendant contributorily infringed the plaintiff's mark "knowingly, intentionally, and with callous disregard for the rights of

[the plaintiff] in its trademark." 878 F.2d at 657.

■ 36. When Stroup held out to the public and sold unlicensed *"SARATOGA"* T-shirts as licensed *"SARATOGA"* T-shirts, it violated the Lanham Act as well as New York's law of unfair competition.

37. As the Court previously discussed, the evidence before it strongly indicates that Stroup infringed plaintiff's marks knowingly, intentionally, and with callous disregard for NYRA's rights in its marks. Stroup failed to present any evidence to the contrary during the bench trial the Court held on the issue of damages. Thus, NYRA is entitled to punitive damages. In order to sanction Stroup for the obstinate and arrogant manner in which it continually violated NYRA's marks, and in order to deter Stroup and others who may have incentives to infringe trademarks knowingly and deliberately in the future, the Court will double the already-trebled profits and damages awards. This brings the total damages award to $34,418.28, exclusive of costs and attorneys' fees.

## FOR THE FOREGOING REASONS, IT IS HEREBY ORDERED THAT:

For its deliberate infringement of NYRA's trademark, in violation of the Lanham Act and New York's law of unfair competition, defendant Stroup News Agency shall, within five (5) days of its receipt of this Order, remit to NYRA the sum of $34,418.28, which amount reflects Stroup's profits from its infringing activities, trebled, the actual damages Stroup's infringing activities caused NYRA, trebled, and a punitive award of twice the sum of these two amounts; and it is further ORDERED that

NYRA is entitled to recover the costs of this action from Stroup; and it is further ORDERED that

Within thirty (30) days of their receipt of this order, the parties shall, if they so choose, file affidavits, briefs, and, in NYRA's case, billing statements, on the basis of which the Court will determine the amount of attor-

neys' fees to which NYRA is entitled to recover from Stroup under the Lanham Act.

**SO ORDERED.**