# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-3585

WMS GAMING INC.,

*Plaintiff-Appellant,*

*v.*

WPC GAMING PRODUCTIONS LTD. and
PARTYGAMING PLC,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 7100—**Blanche M. Manning**, *Judge.*

———————

ARGUED FEBRUARY 25, 2008—DECIDED SEPTEMBER 8, 2008

———————

Before ROVNER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* This appeal involves a trademark-infringement dispute between gaming companies. It began when WMS Gaming, Inc. ("WMS"), sued WPC Productions Ltd. and its parent corporation, PartyGaming PLC (collectively, "PartyGaming" or "the defendants"), for PartyGaming's unapologetic infringement of WMS's registered trademarks JACKPOT PARTY and SUPER

JACKPOT PARTY. PartyGaming is based in Gibraltar, but the electronic gaming services that it provides span the globe. After several failed attempts to persuade PartyGaming voluntarily to cease its infringing uses of WMS's marks, WMS filed this suit in federal district court seeking injunctive relief, damages, and an equitable accounting of the profits PartyGaming reaped from its use of WMS's marks in the United States.

Despite receiving proper notice, the defendants have opted to ignore WMS's lawsuit entirely. The result was a default judgment for both monetary and injunctive relief entered in WMS's favor. Believing that it was entitled to additional relief, however, WMS appealed, arguing that the district court applied the wrong standard to its claim for an accounting of profits. We reverse.

**I**

WMS has manufactured, sold, and leased gaming devices, including slot machines, for many years. Since as early as 1998, WMS has used the JACKPOT PARTY trademark (U.S. Reg. No. 2,283,967) in interstate commerce in connection with its goods, and since as early as October 5, 2004, it has used the SUPER JACKPOT PARTY trademark (U.S. Reg. No. 2,952,924) in the same way. Under U.S. law, these registrations constitute conclusive evidence of WMS's exclusive rights to the underlying marks for the uses specified in the registrations, see 15 U.S.C. § 1115(b), and they also provide nationwide constructive notice of WMS's rights to the underlying marks, dating back to the filing dates of the applications

from which the registrations matured: December 9, 1997, for JACKPOT PARTY, and February 22, 2002, for SUPER JACKPOT PARTY, *id.* § 1057(c).

PartyGaming's business is online gaming, including slot machines, poker, bingo, sports betting, and other casino games. During the years 2004, 2005, and 2006, PartyGaming used approximate and even exact reproductions of WMS's marks for that business, throughout the world and in the United States. Its use of WMS's marks is well-documented and has occurred frequently and persistently throughout the years in question.

In addition to having constructive notice of WMS's ownership of the trademarks by virtue of their registration with the U.S. Patent and Trademark Office ("PTO"), PartyGaming also had actual notice that WMS owned the JACKPOT PARTY mark by the beginning of 2005. At that time, it attempted to register the mark "PARTYJACKPOT" with the PTO, but the PTO promptly rejected the request because it found that the mark was "confusingly similar" to WMS's prior registered mark JACKPOT PARTY. This was not enough to prompt PartyGaming to abandon its *use* of the mark. To the contrary, the record shows that it instead expanded its use after the PTO's action, and with its use, the profits it derived from the mark. According to PartyGaming's 2005 Annual Report, available from its website, the company earned $977.7 million in total revenue that year, of which 84%, or $820 million, came from U.S. customers. (See http://www.partygaming.com, 2005 Annual Report at 80, 87 (follow "Investors" hyperlink to "Financial Performance"

and then "Financial Reports" hyperlinks), report reproduced in App. vol. 1, at 141 ff.) PartyGaming also continued for several months to pursue its application in the United States to register PARTYJACKPOT, ultimately forcing WMS to oppose that application in litigation before the Trademark Trial and Appeal Board.

While that litigation was pending, the U.S. Congress passed the Unlawful Internet Gambling Enforcement Act, Pub. L. No. 109-347, 120 Stat. 1952 (2006) ("UIGEA"), which effectively prohibited gambling businesses from receiving proceeds or monies in connection with online gambling. Up until that point (late 2006), the largest source of PartyGaming's revenues, by far, was the United States. In the wake of the UIGEA's enactment, however, PartyGaming decided to cease its operations in the U.S. market. It also abandoned its application and litigation in this country regarding the PARTYJACKPOT mark.

Once again, however, PartyGaming did not abandon its use of WMS's trademarks. It continued, for a time, to rake in hundreds of millions of dollars in revenues from U.S. customers. When amicable efforts to resolve the dispute failed, WMS filed this suit, which, as we noted, PartyGaming chose to boycott despite proper service of process. Eventually, the district court, having found that it had subject-matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. § 1338 (and, we might add, apparently 28 U.S.C. § 1332(a)(2)), and that the requirements of Illinois's long-arm statute, 735 ILCS 5/2-209 were satisfied, granted WMS's motion for entry of default judgment. Its order, entered July 19, 2007, awarded damages to

WMS in the amount of $2,673,422.10. It also granted injunctive relief, the terms of which it provided in an order entered on September 21, 2007.

Though the district court granted relief to WMS, the monetary award that WMS had sought was exponentially larger than the one it got: WMS had requested $287,391,140.70. It arrived at this figure by determining the total amount of revenue that PartyGaming had earned as a result of its business in the United States in 2004, 2005, and 2006. WMS obtained that data from PartyGaming's website, which featured links to its public financial statements and annual revenue reports. The reports (which we have in the substantial Appendices that WMS has filed) reveal, in PartyGaming's own words and colorful charts, the hundreds of millions of dollars that it earned during the years in question. The reports even separate the revenues into "U.S." and "non-U.S." revenues. When it became clear that PartyGaming would not respond to WMS's lawsuit, WMS turned its focus to the accounting-of-profits remedy it wanted, and it used the defendants' annual reports to estimate how much money the defendants had earned in the United States while infringing WMS's trademark rights.

The district court concluded that WMS's estimate of its 2004 damages was "reasonable." That amount was $891,140.70, and it was significantly lower than the estimates for 2005 and 2006, because the revenues for the later years reflected PartyGaming's expanded use of the marks. In the district court's view, however, WMS's estimates for 2005 and 2006 could not "be ascertained with

reasonable certainty" and were "clearly excessive." It therefore based its awards for those years not in the amounts that WMS had requested, but instead on the same amount that it had deemed "reasonable" for 2004: $891,140.70. The result was the total award reflected in the court's order, $2,673,422.10.

WMS responded with a motion under FED. R. CIV. P. 59(e) to alter or amend the judgment. In its motion, it tried to persuade the district court that it had committed legal error by applying the standard for actual damages in its order for default judgment, rather than the proper (and more flexible) standard for an equitable accounting of profits. Both types of relief are available under the Lanham Act to redress trademark infringement, see 15 U.S.C. § 1117(a), and they are distinct remedies with different legal standards and burdens of proof. The district court denied the Rule 59(e) motion; it remained committed to its prior interpretation of WMS's request as one for "damages" and concluded again that WMS was asking for "damages that are clearly excessive" and "cannot be ascertained with reasonable certainty."

## II

Before proceeding to the substance of WMS's claims, we believe that it is prudent to assure ourselves that the federal courts have jurisdiction over this lawsuit. The statutes on which the district court based its conclusion that subject-matter jurisdiction exists were 15 U.S.C. § 1121 and 28 U.S.C. § 1338. See 15 U.S.C. § 1121(a) (granting original jurisdiction to the district courts, and appellate

jurisdiction to the circuit courts of appeals, "of all actions arising under this chapter [Chapter 22: Trademarks], without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties"); 28 U.S.C. § 1338(a) (granting exclusive jurisdiction to the district courts "of any civil action arising under any Act of Congress relating to patents, . . . copyrights and trademarks"); and 28 U.S.C. § 1338(b) (granting the district courts "original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws"). WMS's claims fall squarely within the scope of these statutes.

Our appellate jurisdiction is secure because the defendants were properly served but failed to appear or answer WMS's complaint. They therefore were found to be in default, and the district court's entry of default judgment and later denial of WMS's Rule 59(e) motion constitutes an appealable judgment. Though a few loose ends remain in the district court (namely, WMS's motion for fees and costs and a separate motion to have the defendants held in contempt), those collateral issues do not affect the existence of appellate jurisdiction for purposes of the issues before us. See *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175 (1989) (costs); *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199-201 (1988) (attorneys' fees).

We also note that while the defendants had the opportunity to contest the district court's personal jurisdiction over them, they have now waived their opportunity to

do so. See FED. R. CIV. P. 12(h)(1). While we thus cannot rule on the point, it does appear to us that their business contacts with the United States probably would have sufficed to secure personal jurisdiction under FED. R. CIV. P. 4(k)(2). *Cf. Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 715-16 (1982) (Powell, J., concurring in the judgment) (court should assure itself of *prima facie* support for personal jurisdiction).

## III

WMS's appeal rests on its position that the district court misconstrued its request for relief as limited to one for actual damages, rather than seeing it for what it was: a request for the separate remedies of damages at law (if possible) *and* an equitable accounting of profits. Indeed, WMS maintains that its central claim was for an accounting, not for damages, and so the district court committed reversible error when it failed to recognize that distinct standards apply to each type of claim, which in turn led it to conflate the standards for damages with those that govern an equitable accounting of profits.

We begin by noting that because this was a default judgment, the usual rule that a party should be given the relief to which it is entitled whether or not it has requested that relief does not apply. See FED. R. CIV. P. 54(c). Instead, Rule 54(c) stipulates that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." WMS's pleadings thus are more important, for purposes of relief,

than they would have been had PartyGaming appeared and contested the case.

That said, we find it clear from WMS's filings in the district court that, contrary to the assumption in the district court's orders of July 19, 2007, and September 24, 2007, WMS has throughout this litigation requested an equitable accounting of profits, rather than—or at least in addition to—actual damages. In its six-count complaint, WMS repeatedly stated that it sought the equitable remedies of injunctive relief and an accounting of profits, and it asserted multiple times that "there is no adequate remedy at law" for the defendants' actions. The complaint also asks for attorneys' fees, costs, statutory damages, treble damages, punitive damages, and, at a few points, actual damages. All of the paragraphs requesting actual damages *also* request an accounting of profits. From the start, then, WMS recognized the distinction between these two types of relief and properly requested that the court consider both. The complaint also shows that the request for an accounting appears far more often than the request for actual damages. WMS thus did not bury or obscure its requests for an accounting, nor did it attempt a sudden change of course midway through the proceedings.

WMS's motion for entry of default judgment continues this theme. This motion, filed after WMS realized that PartyGaming would not respond or participate in this litigation in any way, asks only for "injunctive relief and . . . an accounting of profits." Similarly, WMS's memorandum in support of entry of default judgment

requested only statutory damages (available for willful infringement), injunctive relief, and "an accounting of defendants' profits while operating under the infringing marks"; it makes no mention at any point of a request for actual damages.

Section 35 of the Lanham Act, on which WMS was relying, has this to say, in relevant part, about a plaintiff's remedies:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circum-stances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. . . .

15 U.S.C. § 1117(a).

We agree with WMS that the district court, despite mentioning in passing the proper standard for an accounting of profits, made a fundamental error of law by failing to distinguish between WMS's right to the defendants' profits and its right to its damages. In its order of July 19, 2007, the district court referred to WMS's "requests for damages." It then noted that "the plaintiff must provide evidence to the court so that it may . . . 'ascertain the amount of damages with reasonable certainty.'" The court quoted from *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004), which had quoted *Credit Lyonnais Securities (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999). Both of those cases dealt with claims for actual damages, not for an accounting of profits.

The court then set forth the three "types of damages" that "are available for the infringement of trademarks," quoting in part the language from section 35 of the Lanham Act that we have furnished above. But after doing so, the district court did not follow through with two separate computations, one for the accounting and one for damages. The result was that the court incorporated into its accounting-of-profits analysis the additional considerations of whether the "damages" could be "ascertained with reasonable certainty," and whether WMS had proven that its calculation properly separated out the revenues gained from lawful business as opposed to infringing uses of WMS's marks. In rejecting WMS's estimate of profits for 2005, for example, the court stated:

> Although the defendants' Annual Report reported revenue attributable to casino games, it did not identify

which portion of that revenue was attributable to games that infringed WMS' mark. According to WMS' own submissions, the defendants offered a wide variety of casino games, including "poker, bingo, backgammon, sports betting," and slot machines, which presumably included slot machines that did not infringe WMS' marks. Therefore, the revenue amount upon which WMS based its damages calculation overstated the revenue generated by the defendants' infringing uses of WMS' marks. WMS has not identified any information from which the court can calculate what percentage of the defendants' casino revenues are attributable to the defendants' infringing uses of WMS' marks.

The court applied the same reasoning when rejecting WMS's 2006 estimate. This analysis was based on the wrong standard. The Supreme Court held nearly a century ago in *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251 (1916), that "the owner of the trademark is entitled to so much of the profit as resulted from the use of the trademark," and while it is often difficult to "ascertain[ ] what proportion of the profit is due to the trademark, and what to the intrinsic value of the commodity"—such that the proper proportional often "cannot be ascertained with any reasonable certainty"—the Court decided that

> it is more consonant with reason and justice that the owner of the trademark should have the whole profit than that he should be deprived of any part of it by the fraudulent act of the defendant. It is the same

principle which is applicable to a confusion of goods. If one wrongfully mixes his own goods with those of another, so that they cannot be distinguished and separated, he shall lose the whole, for the reason that the fault is his; and it is but just that he should suffer the loss rather than an innocent party, who in no degree contributed to the wrong.

240 U.S. at 262.

Thus, when the district court in this case assumed that it had to segregate PartyGaming's legitimate revenues from those that PartyGaming derived through its infringement, and that WMS had to bear the risk of uncertainty about the proper characterization of the revenues, it erred. Moreover, as WMS points out, it was more generous to PartyGaming than it had to be when it used low-end estimates and U.S.-only revenues to calculate its estimates. In doing so, the court relieved PartyGaming of its burden to show which portions of its gross income were not attributable to its infringing uses. The Supreme Court has made it clear, both in *Hamilton-Brown Shoe Co.* and in later cases, that

[t]he burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316
U.S. 203, 206-07 (1942). The Court in *Mishawaka* went on
to note that, unless the infringer could provide evidence
that it did not earn some or all of its profits by infringing
the owner's marks, "it promotes honesty and comports
with experience to assume that the wrongdoer who
makes profits from the sales of goods bearing a mark
belonging to another was enabled to do so because he
was drawing upon the good will generated by that mark."
*Id.* at 207; see also *Nintendo of Am., Inc. v. Dragon Pac. Int'l*,
40 F.3d 1007, 1012 (9th Cir. 1994) ("[W]here infringing
and noninfringing elements of a work cannot be readily
separated, all of a defendant's profits should be awarded
to a plaintiff."); *Wesco Mfg. v. Tropical Attractions of Palm
Beach, Inc.*, 833 F.2d 1484, 1488 (5th Cir. 1987) ("Although
the exact amount of infringing sales cannot be deter-
mined from the [evidence], exactness is not required. [The
defendant] is in the best position to ascertain exact sales
and profits, and it bears the burden of doing so in an
accounting."); *id.* at 1487-88 ("A plaintiff need not demon-
strate actual damage to obtain an accounting of an in-
fringer's profits under section 35 of the Lanham Act. It is
enough that the plaintiff proves the infringer's sales. The
burden then shifts to the defendant, which must prove
its expenses and other deductions from gross sales."
(citations omitted)).

The burden was therefore on PartyGaming to show that
certain portions of its revenues—which for purposes of
the award after its default judgment WMS established by
using PartyGaming's own public financial statements and
reports—were not obtained through its infringement of

WMS's marks. There was no evidence in the record that would have helped PartyGaming to meet that burden. As the Second Circuit noted in *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966 (2d Cir. 1985),

> [p]laintiffs here proved defendants' sales, using defendants' own words. The burden then shifted, requiring defendants to prove costs or deductions. Defendants failed to sustain their burden. In the absence of any evidence introduced by defendants, the court's reliance on defendants' videotaped statements as to their profits was not unreasonable.

*Id*. at 973.

Similarly, in this case PartyGaming has not come forward with any evidence suggesting that deductions are warranted from the revenues that its own annual reports reflect. Courts consistently find that when a trademark plaintiff offers evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales. See, *e.g., Tex. Tech. v. Spiegelberg*, 461 F. Supp. 2d 510, 526 (N.D. Tex. 2006); *N.Y. Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295, 301 (N.D.N.Y. 1996).

WMS has provided evidence of the profits that PartyGaming earned from its U.S. sales. In the absence of evidence from PartyGaming showing that deductions are warranted, WMS is entitled to the revenues supported by its evidence. A remand is necessary so that the district court can assess WMS's claim for an accounting in accordance with the proper legal standard for that claim.

We add that while the figure WMS seeks, $287,391,140.70, is considerably larger than the "damages" award granted by the district court, $2,673,422.10, the record shows that in a single year (2005), the defendants reported revenues of $977.7 million—nearly $1 billion. WMS urges that "this is not a case in which [the plaintiff] is seeking wildly excessive relief." Be that as it may, it is Congress that has specified the types of relief to which WMS is entitled, and it is our job to uphold those rules. The record shows persistent, pervasive, knowing, and willing infringement for several years by PartyGaming, as it repeatedly refused to cease and desist even after receiving several forms of actual notice of its unlawful activity, from both the PTO and from WMS. We therefore REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.