

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-22-2005

# Banjo Buddies Inc v. Renosky

Precedential or Non-Precedential: Precedential

Docket No. 03-2038

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Banjo Buddies Inc v. Renosky" (2005). *2005 Decisions.* Paper 1501.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1501

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos: 03-2038/2107

_____

BANJO BUDDIES, INC.

v.

JOSEPH F. RENOSKY,

Appellant

_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 99-cv-01389)
District Judge: Donetta W. Ambrose

_____

Argued March 23, 2004

Before: ROTH, AMBRO and CHERTOFF*, Circuit Judges

_____
        *Judge Chertoff heard oral argument in this case but
resigned prior to the time the opinion was filed. The opinion
is filed by a quorum of the panel. 28 U.S.C. § 46(d).

(Opinion filed : February 22, 2005)

Wayne A. Kablack, Esquire (Argued)
Simpson, Kablack & Bell
834 Philadelphia Street, Suite 200
Indiana, PA 15701

John J. Richardson, Esquire
C. James Zeszutek
Thorp, Reed & Armstrong
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh, PA 15219

**Counsel for Appellant/Cross Appellee**

Todd S. Holbrook, Esquire (Argued)
Bernstein, Shur, Sawyer & Nelson
100 Middle Street
P.O. Box 9729
Portland, ME 04104

Mark A. Willard, Esquire
Eckert, Seamans, Cherin & Mellott
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

**Counsel for Appellee/Cross Appellant**

OPINION

ROTH, Circuit Judge:

This appeal requires us to decide whether a showing of willful infringement is a prerequisite to an accounting of a trademark infringer's profits for a violation of section 43(a) of the Lanham Act. We hold that wilfulness is an important equitable factor but not a prerequisite to such an award, noting that our contrary position in *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 190 (3d Cir. 1999), has been superseded by a 1999 amendment to the Lanham Act. We further affirm the District Court's resolution of several other damages issues, with a single exception explained below.

## I. Factual Background and Procedural History

Joseph Renosky was a member of the board of directors of Banjo Buddies, Inc., ("Banjo Buddies" or "BBI") from February 1996 until May 1999. Banjo Buddies' principal product during that time was an extremely successful fishing lure called the Banjo Minnow, which Renosky helped develop.

The Banjo Minnow was principally advertised via "infomercial" broadcast, and was also sold in sporting goods catalogs and sporting goods stores. Tristar Products, Inc., obtained exclusive rights to advertise and sell the Banjo Minnow through all forms of "direct response marketing, . . . print media, and retail distribution." BBI received 48% of Tristar's net profits in return. Renosky agreed to provide the manufactured Banjo Minnow lure kit through his corporation,

3

Renosky Lures, Inc., to both Tristar and BBI at $5.20 per kit.[1] Renosky received additional shares of BBI stock in exchange for producing the Banjo Minnow kits at a "fair price." Renosky also executed a non-compete agreement in favor of BBI in exchange for more BBI stock. The Banjo Minnow sold very well for a little over a year, from mid-1996 through mid-1997, but then sales dwindled considerably. BBI introduced several derivative Banjo Minnow products in 1998, but none approached the success of the original.

During the Banjo Minnow's early success in 1996, Renosky presented an idea to the BBI board for a "new and improved" Banjo Minnow called the Bionic Minnow.[2] The board took no formal action on the proposal, and a month later Renosky advised one of BBI's directors that he would develop the new lure independently. At least two board members urged Renosky against this course of action, but Renosky could not be swayed. He immediately began developing the Bionic Minnow through Renosky Lures and ultimately marketed the new lure via infomercial and other means beginning in February 1999.

---

[1] The kit consisted of numerous plastic minnow bodies of various sizes and colors as well as hooks, jigs, and other fishing bait paraphernalia, all in a plastic "clam-shell" box. The kit also included an instructional videotape.

[2] The Bionic Minnow kit is distinguished from the Banjo Minnow kit largely by minnow bodies with replaceable heads and the "weedless treble hook," a hook designed to reduce the chance of debris catching on the barbs of the hook.

After Renosky failed to comply with a "cease and desist" letter, BBI brought suit in the United States District Court for the Western District of Pennsylvania in April 1999. BBI alleged that Renosky violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by developing and marketing the Bionic Minnow in such a way that customers would believe the Bionic Minnow was a Banjo Buddies product. BBI also alleged that Renosky's conduct breached the non-compete contract and Renosky's fiduciary duties as an officer of Banjo Buddies.[3]

The District Court denied cross-motions for partial summary judgment and held a five-day bench trial in May 2002. In its Findings of Fact and Conclusions of Law issued in November 2002, the court found that Renosky was liable for "false designation of origin" under § 43(a) of the Lanham Act.[4] The court further found that Renosky breached his

_____

[3] BBI made several other claims, and Renosky made several counterclaims, none of which is relevant to this appeal.

[4] Section 43(a) provides in relevant part:
(1) Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the . . . origin,

fiduciary duty of loyalty to Banjo Buddies by pursuing a corporate opportunity — the Bionic Minnow project — without fully disclosing his actions to the board or forcing the board to accept or reject the project. The court also found that Renosky breached the non-compete agreement by independently developing the Bionic Minnow. Finally, the court found that Renosky breached his fiduciary duty of good faith and fair dealing by overcharging BBI for the Banjo Minnow kits.

The District Court concluded that Renosky should be forced to disgorge the net profits of the Bionic Minnow project under section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), which provides for such accountings as an equitable remedy for Lanham Act violations. The District Court also concluded that the damages arising from Renosky's usurpation of a corporate opportunity, breach of the non-compete contract, and overcharging for the Banjo Minnow lure kits were too speculative to support any monetary award.

Accordingly, the District Court ordered Renosky to pay to Banjo Buddies the net profits earned by the Bionic Minnow project, and to produce "verified financial records" attesting

---

> sponsorship, or approval of his or her goods, services or commercial activities by another person . . .
>
> \* \* \* \* \*
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

6

to this amount. Renosky never produced these records, despite numerous delays and court orders. Renosky did ultimately retain an independent financial analysis (the "Alpern Report"), which the District Court accepted for purposes of establishing the total sales of the Bionic Minnow through November 2002. However, the court rejected that report's conclusion that the Bionic Minnow project suffered a net loss. Accordingly, the court calculated Renosky's profits by multiplying the total sales figure by 16%, based on testimony from Renosky's business manager that Renosky Lures products typically earn a "bottom line" of between 15-17%. The court also determined that Renosky should be forced to disgorge all of the distributions (based on gross sales) made to him as a shareholder in the Bionic Minnow project. The court entered judgment in March 2003 against Renosky in the amount of $1,589,155.

Banjo Buddies moved to alter or amend the District Court's judgment pursuant to Federal Rule of Civil Procedure 59(e), arguing that the court erred by holding that the damages arising from Renosky's overcharges for the Banjo Minnow lure kits were too speculative to support a monetary award. The District Court denied this motion in March 2003.

Renosky and BBI both appeal the District Court's judgment. Renosky asserts that the District Court should not have ordered an accounting of profits because Renosky did not intentionally or willfully confuse or deceive customers. Renosky alternatively argues that the District Court's calculation of those profits was clearly erroneous. Banjo Buddies cross-appeals, contending that the District Court erred by refusing to award damages for Renosky's overcharges rather than make a reasonable estimate of

7

damages based on the available evidence.

## II.  Jurisdiction and Standards of Review

The District Court had federal question jurisdiction over Banjo Buddies' Lanham Act claim, 28 U.S.C. § 1331, supplemental jurisdiction over the parties' state law claims, 28 U.S.C. § 1367, and diversity jurisdiction over all claims owing to the complete diversity of the parties, 28 U.S.C. § 1332.  We have appellate jurisdiction to review the District Court's final judgment.  28 U.S.C. § 1291.

We review the District Court's factual findings under a clearly erroneous standard, but exercise plenary review over the District Court's interpretation of legal questions and its application of the law to the facts.  *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 950 (3d Cir. 1993).  We further review the District Court's award of equitable remedies under section 35(a) of the Lanham Act under an abuse of discretion standard.  *Gucci America, Inc. v. Daffy's, Inc.*, 354 F.3d 228, 242 (3th Cir. 2003).

## III.  Discussion

### A.      Willfulness Is a Factor, Not a Prerequisite.

Renosky argues that the District Court erred by awarding profits from the Bionic Minnow project to Banjo Buddies under section 35(a) of the Lanham Act because Renosky's violation of section 43(a) of that statute was not willful or intentional.  Renosky relies on *SecuraComm Consulting, Inc. v. Securacom, Inc.*, 166 F.3d 182 (3d Cir. 1999), in which this court held that "a plaintiff must prove that an infringer acted willfully before the infringer's profits

are recoverable" under § 35(a) of the Lanham Act. *Id.* at 190 (citing *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992)). The District Court's findings related to the issue of Renosky's intent are ambiguous and possibly contradictory.[5] However, we need not decide whether the District Court found or should have found that Renosky acted willfully, because we conclude that *SecuraComm*'s bright-line willfulness requirement has been superseded by statute and that, based on all the relevant equitable factors, the District Court did not abuse its discretion by ordering an accounting of Renosky's profits.

*SecuraComm*'s bright-line rule was the dominant view when *SecuraComm* was issued in January 1999. *See, e.g., Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 347-48 (5th Cir. 2002) (collecting cases, including *SecuraComm*); *George Basch Co.*, 968 F.2d at 1537; *Restatement (Third) of Unfair Competition* § 37 (1995); J.

---

[5] On the one hand, that District Court found that Renosky exhibited "a considerable lack of good faith and fair dealing" by producing a nearly identical product in identical packaging, using the same primary marketing tool (the infomercial) with similar content, and by presenting himself as the developer of the Banjo Minnow in marketing materials for the Bionic Minnow. On the other hand, the court found that even though Renosky copied the successful format of the Banjo Minnow product and infomercial, "there is no evidence that [Renosky] deliberately intended by that copying to confuse consumers into believing that the Bionic Minnow was a Banjo Buddies project."

9

Thomas McCarthy, 5 *McCarthy on Trademarks and Unfair Competition* § 30:62 (4th ed. 1996). In August 1999, however, Congress amended § 35. Prior to the amendment, that section provided as follows:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 43(a) [15 U.S.C. § 1125(a)], shall have been established . . . the plaintiff shall be entitled . . ., subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

*See SecuraComm*, 166 F.3d at 186 (quoting former 15 U.S.C. § 1117(a)). The 1999 amendment replaced "or a violation under section 43(a)" with "a violation under section 43(a), or a *willful* violation under section 43(c)," *see* Pub. L. No. 106-43, § 3(b), 113 Stat. 219 (Aug. 5, 1999) (emphasis added). The plain language of the amendment indicates that Congress intended to condition monetary awards for § 43(c) violations, but not § 43(a) violations, on a showing of willfulness.[6]

---

[6] The statute has been twice amended since August 1999, *see* Pub. L. No. 106-113, Div. B, § 1000(a)(9), 113 Stat. 1536, 1501A-54 (Nov. 29, 1999), *and* Pub. L. No. 107-273, Div. C, Tit. III, § 13207(a), 116 Stat. 1906 (Nov. 2, 2002), and now reads as follows:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title,

We presume Congress was aware that most courts had consistently required a showing of willfulness prior to disgorgement of an infringer's profits in Lanham Act cases, despite the absence of the word "willful" in the statutory text prior to 1999. *See Scheidemann v. INS*, 83 F.3d 1517, 1525 (3d Cir. 1996) ("[W]e must presume that Congress is aware of existing judicial interpretations of statutes."). By adding this word to the statute in 1999, but limiting it to § 43(c) violations, Congress effectively superseded the willfulness requirement as applied to § 43(a). *See Russello v. U.S.*, 464 U.S. 16, 23 (1983) (" 'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

This conclusion is supported by *Quick Technologies*, 313 F.3d at 349, the only other appellate decision to reach the issue. The Fifth Circuit in *Quick Technologies* considered the effect of the 1999 amendment and held that, based on earlier decisions of that court as well as "the plain language of [§ 43(a)]," willful infringement was not a prerequisite to an

shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.
15 U.S.C. § 1117(a).

11

accounting of the infringer's profits.  *Id.*  The court noted the wealth of contrary authority, including *SecuraComm*, but pointed out that all of those cases preceded the statutory change.  *Id.* at 347-48.  The *Quick Technologies* court reaffirmed the factor-based approach elaborated in prior Fifth Circuit cases, including *Pebble Beach Co. v. Tour 18 I Limited*, 155 F.3d 526, 554 (5th Cir. 1998), explaining that the infringer's intent was an important — but not indispensable — factor in evaluating whether equity supports disgorging the infringer's profits.  *Quick Techs.*, 313 F.3d at 349.  These factors "include, but are not limited to (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off."  *Id.* (internal citations omitted).

In *Gucci America, Inc. v. Daffy's, Inc.*, 354 F.3d 228 (3d Cir. 2003), the panel majority noted that the 1999 amendment might affect the continued validity of *SecuraComm*'s bright-line willfulness requirement.  *Id.* at 239-40 (noting that statutory language and legislative history of the 1999 amendment "suggests that willfulness is a prerequisite in a trademark dilution cause of action, not an infringement action").  The majority determined it did not need to decide the issue, however, reasoning that even under the *Quick Technologies* factor-based approach, the District Court did not abuse its discretion in refusing to order an accounting of the infringer's profits.  *Id.* at 241-43 ("Accordingly, even after the 1999 amendments to the Lanham Act and any impact it may have had on our holding

12

in *SecuraComm*, we nevertheless conclude that the district court did not abuse its discretion given the equities here, including Daffy's good faith.").[7]

For the reasons explained above, we now hold that *SecuraComm* has been superceded by the 1999 amendment. Relying on the *Quick Technologies* factor-based approach endorsed in *Gucci America*, we further conclude that the District Court did not abuse its discretion by ordering an accounting of Renosky's profits. Apart from his contention that his violation was not willful, Renosky does not argue that the District Court abused its discretion. Accordingly, our consideration of the equities here will be brief. Because the District Court's findings concerning Renosky's intent are difficult to reconcile, *see supra* note 5, we will assume that factor is neutral. Nonetheless, all of the other *Quick Technologies* factors support an award of profits here.

It is likely that Renosky's conduct diverted sales from Banjo Buddies. *See Quick Techs.*, 313 F.3d at 349 (factor two). The District Court found that Renosky's marketing for the Bionic Minnow was confusingly similar to that of the Banjo Minnow, noting numerous material similarities in the

---

[7]     Judge Rosenn wrote a dissenting opinion in *Gucci America*, concluding that the balance of equities favored the plaintiff, and that an accounting of the infringer's profits would make the trademark owner whole. 354 F.3d at 246-47 (Rosenn, J., dissenting). Judge Rosenn specifically concluded that *SecuraComm* "is no longer binding precedent because it has been superceded by subsequent statutory amendments to the Lanham Act." *Id.* at 245.

13

infomercials used to market each product. The court also found that the two lure kits were "nearly identical" and were packaged identically. The court further found that the markets for the two products were "either the same or substantially overlap[ping]." The District Court's observations concerning the close similarities of the products as well as their packaging and marketing schemes also strongly support the conclusion that Renosky was "palming off" the Bionic Minnow as a Banjo Buddies product. *See id.* (factor six). The public has an interest in discouraging this type of behavior, as it interferes with the consumer's ability to make informed purchasing decisions. *See id.* (factor five).

Next, there are no other adequate remedies. *See id.* (factor three). The District Court rejected Banjo Buddies' estimation of its damages (for both the Lanham Act claims and the state law claims) as too speculative. If Renosky's profits are not assessed, Banjo Buddies will be wholly uncompensated for Renosky's infringing actions. Finally, Banjo Buddies did not delay in bringing suit to stop Renosky's infringing actions. *See id.* (factor four). Accordingly, we conclude that the District Court did not abuse its discretion in deciding to order an accounting of Renosky's profits.

## B. The District Court's Estimation of Profits.

The remaining issues in Renosky's appeal concern the District Court's calculation of the amount of profits to be awarded. We first hold that the District Court did not clearly err by rejecting Renosky's contention that he suffered a net loss on the Bionic Minnow project, and did not abuse its

14

discretion by using an alternative method to estimate Renosky's profits. *See Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 39 (1st Cir. 2002) (calculation of profits under section 35(a) is left to the trial court's discretion, and will not be disturbed unless "it rests on clearly erroneous findings of fact, incorrect legal standards, or a meaningful error in judgment").

Section 35(a) provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a); *see also Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 273 (3d Cir. 1975).  The District Court accepted the Alpern report's figure for total sales of the Bionic Minnow through November 22, 2002. Thus, Banjo Buddies' burden of proof was satisfied by Renosky's accountant's financial report.

However, the District Court held that Renosky failed to satisfy his burden of proof regarding costs and deductions. The District Court rejected the Alpern report's conclusion that Renosky suffered a loss of $ 492,699.00 for several reasons, most of which Renosky makes no attempt to refute on appeal. First, the court observed that the Alpern report's summary of direct expenses associated with the Bionic Minnow project — totaling almost five million dollars — was sorely lacking in detail, lumping costs into six broad categories with no explanation of what specific expenses those categories represented.[8]  Renosky appears to argue that the District Court

_____

[8]  As the court explained, "I find disturbing an analysis which includes calculations to the penny for the cost of the

15

improperly rejected the direct expense summary because the preparers of the Alpern report were unable to confirm expenses associated with Pacific Media, a vendor representing no more than two percent of the direct expenses associated with the Bionic Minnow. This argument is a red herring. The court rejected the summary *in spite of* the preparers' success in obtaining corroboration from most major vendors, not because of its failure to obtain corroboration from one.

Renosky fails to address the District Court's remaining reasons for rejecting the Alpern report's analysis of costs associated with the Bionic Minnow project. Most important, Renosky makes no attempt to explain why he twice failed to produce verified financial records supporting his claimed costs and deductions as ordered by the court.[9] The court also observed several unexplained discrepancies between the Alpern report's summary of direct expenses and other evidence in the record. Next, the court rejected the Alpern report's conclusion that "shared expenses" associated with the Bionic Minnow project were $ 1,416,050. The court explained that the Alpern report did not show how "each item of general expense contributed to the production of the infringing items in issue and offer a fair and acceptable

---

product (less than $2 million total) but fails to explain expenses totaling almost $5 million [by] providing even a modicum of detail in support."

[9]    The Alpern report contains summaries of financial records, not the records themselves.

16

formula for allocating a given portion of overhead to the particular infringing items at issue." (citing *Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 565-66 (2d Cir. 1994)). Finally, the court found that the Alpern report's "bottom line" lacked credibility. The court doubted that Renosky would allow the Bionic Minnow to lose nearly half a million dollars, and noted that Renosky's claimed loss was inconsistent with his attempt to secure clarification that profits accrued after November 22, 2002, would belong to him and not Banjo Buddies. Considering the collective strength of these arguments together with Renosky's failure to address most of them, we conclude that the District Court's rejection of the Alpern report's cost analysis was not clearly erroneous.

Because Renosky failed to meet his burden of proving costs and deductions, the District Court was forced to use an alternative method to estimate Renosky's profits. The court decided to rely on the trial testimony of Renosky's business manager, Denice Altemus, who stated that Renosky Lures products "always [make] a bottom line of between 15 and 17%." Renosky argues that there is no direct evidence that the Bionic Minnow earned a profit in this range. While this is true, the onus of producing such evidence is clearly placed by § 35(a) on Renosky, not Banjo Buddies. 15 U.S.C. § 1117(a). The District Court has broad discretion in shaping remedies under § 35(a), *see Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999), and did not abuse that discretion by estimating that the Bionic Minnow earned a profit of 16%.

Renosky further argues that Banjo Buddies is only entitled to 48% of whatever profits were earned by the Bionic Minnow project. That is, if Banjo Buddies had produced the Bionic Minnow, it would have received only 48% of the

17

profits earned from the sale of the lure under its contract with TriStar. We first note that this contention is impossible to evaluate on appeal as a factual matter. Presumably Tri-Star provided some services in exchange for its profit-sharing agreement with Banjo Buddies, and presumably Renosky procured those same services through services contracts rather than a profit-sharing agreement. There is no way for this court to determine which party struck the better deal.

Further, this argument also fails as a matter of law, because there is no requirement that the defendant's profits approximate the plaintiff's damages. Section 35(a) permits a plaintiff to recover, "subject to the principles of equity . . ., (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). As the Second Circuit observed in *George Basch*, 968 F.2d at 1537, an accounting of the infringer's profits is available if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement. These rationales are stated disjunctively; any one will do. *See id.* Allowing Renosky to keep half the estimated profits of his infringing activities would not serve the Congressional purpose of making infringement unprofitable — Renosky would be unjustly enriched and other would-be infringers would be insufficiently deterred. *See Burger King Corp.*, 169 F.3d at 1321-22; *Louis Vitton S.A. v. Lee*, 875 F.2d 584, 588-89 (7th Cir. 1989); *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274 (9th Cir. 1982). Even if Banjo Buddies receives a windfall in this case — which, as discussed in the previous paragraph, is impossible for this court to determine — it is preferable that Banjo Buddies rather than Renosky receive the benefits of

18

Renosky's infringement.  *See Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-07 (1942).

Finally, we agree with Renosky that the District Court clearly erred by adding distributions made to Renosky as a shareholder in the Bionic Minnow project to the profits award because these distributions were already accounted for in the court's estimation of profits.  Financial records prepared by Renosky Lures' business manager and introduced at trial by Banjo Buddies show that distributions were paid according to a simple formula:  five percent of gross sales each month.  Those records treat the distributions as an expense for bookkeeping purposes.  That is, each month's "Total Profit" was calculated by subtracting expenses from sales, and shareholder distributions (denominated "Return Reserve") were considered expenses in this calculation.  Banjo Buddies added the "Total Profit" and "Return Reserve" figures to arrive at a "Total Net Profit" figure which it then asked the District Court to assess as the measure of profits under section 35(a).  This is sensible — distributing monies to shareholders is a method of disbursing income, not a business expense, and the distributions should be included in the District Court's profits award.  The District Court may have been attempting to apply this reasoning when it determined that Renosky's share of the distributions should be added to the estimated profits award.  However, when the District Court  decided to estimate profits by multiplying the Alpern report's gross sales figure by sixteen percent, rather than use the method proposed by Banjo Buddies, the issue created by Renosky Lure's bookkeeping practice of treating distributions as expenses disappeared.  The court's estimate accounts for all of the profits of the Bionic Minnow project — the shareholder

distributions, which amounted to five percent of gross sales, as well as an estimated eleven percent of additional profit.

### C. Overcharge Damages.

Banjo Buddies argues on cross-appeal that the District Court erred by refusing to award monetary damages after determining that Renosky violated his fiduciary duty by overcharging Banjo Buddies for the Banjo Minnow lure kits. We hold that the District Court properly determined that Banjo Buddies failed to meet its burden of proving the amount of damages to a "reasonable certainty." *Plywood Oshkosh, Inc. v. Van's Realty & Constr. of Appleton, Inc.*, 257 N.W.2d 847, 849 (Wis. 1977) ("The claimant generally has the burden of proving by credible evidence to a reasonable certainty his damage, and the amount thereof must be established at least to a reasonable certainty.").[10]  Specifically,

---

[10]  Banjo Buddies is incorporated in Wisconsin.  As the District Court explained, the "internal affairs doctrine" holds that courts look to the law of the state of incorporation to resolve issues involving the internal affairs of a corporation. *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 89-93 (1987); *First National City Bank v. Banco Para El Comercio*, 462 U.S. 611, 621 (1983).  Because the District Court sits in Pennsylvania, it applies that state's conflict of law principles, *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941), and Pennsylvania has adopted the "internal affairs doctrine" by statute.  *See* 15 Pa. Cons. Stat. § 4145(a); *In re Estate of Hall*, 731 A.2d 617, 622 (Pa. Super. Ct. 1999).  Banjo Buddies' claim that Renosky breached his fiduciary duty of

the District Court did not clearly err by finding that Banjo Buddies' Exhibit 201 was insufficiently reliable. Further, the court did not commit legal error by refusing to estimate damages based on this unreliable exhibit, because Banjo Buddies could have, but failed to, introduce other, more reliable evidence as proof of the amount of damages.

To prove the amount of overcharge, Banjo Buddies combined two approaches. First, Banjo Buddies introduced invoices indicating Renosky's costs for some components of the Banjo Minnow lure kit. The District Court accepted these invoices as reliable proof of Renosky's costs. Banjo Buddies then added estimated overhead and a reasonable profit margin to arrive at the price Renosky should have charged for those components of the lure kit. However, these invoices only accounted for 20 of the 109 components of the Banjo Minnow lure kit. Banjo Buddies introduced Exhibit 201, an undated price quote from Renosky to a third party, National Media, to establish the prices Renosky should have charged Banjo Buddies and Tristar for the remaining 89 components. Combining the invoices (adjusted for overhead and profit) and the price quote, Banjo Buddies contends that Renosky should have charged Tristar and Banjo Buddies $3.44 per lure kit, $1.76 less than the amount actually charged, $5.20. The District Court, however, found the National Media price quote unreliable.

---

good faith and fair dealing by overcharging for the Banjo Minnow lure kits goes to Banjo Buddies' internal affairs. Accordingly, the District Court properly applied Wisconsin law to this issue.

21

This finding was not clearly erroneous. First, the National Media quote is undated. There is evidence that over time some of Renosky's component prices fell, while other component prices, operational expenses, and labor costs rose, after Renosky's business manager produced the quote to Banjo Buddies that established the price of $5.20 per kit in March 1996. Given these fluctuating costs, the District Court properly observed that not knowing the date of the National Media quote makes it difficult to conclude that the component prices quoted therein should have been comparable to those in the Banjo Buddies quote. The District Court further noted that Banjo Buddies' counsel failed to sufficiently question Renosky or his business manager about the National Media quote at trial. Such questioning could have readily established the date and context of the quote, and offered the persons most familiar with the component prices — Renosky and his business manager — an opportunity to explain the different prices in the National Media and Banjo Buddies price quotes. The National Media quote is not inherently unreliable, but given Banjo Buddies' failure to substantiate the quote at trial, the District Court did not err by refusing to rely on the quote.[11]

---

[11] Banjo Buddies' failure to delve into the National Media price quote at trial despite the fact that this document is the linchpin of its damages proof is not as inexplicable as it appears. It turns out that Banjo Buddies did not make the argument that this price quote establishes the appropriate price for most of the components in the Banjo Minnow lure kit until after trial in its proposed findings of fact and conclusions of

Banjo Buddies alternatively argues that the District Court, having found liability, should nonetheless have estimated damages based on the less-than-reliable National Media price quote because it was the only available evidence. As the Wisconsin Supreme Court explained in *Metropolitan Sewerage Comm'n v. R.W. Constr., Inc.*, 255 N.W.2d 293, 299 (Wis. 1977), "where records are inadequate to assess specific damages, yet plaintiff has been injured . . . and liability is clear," "[i]t is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." (Internal citation omitted); *see also Cutler Cranberry Co. v. Oakdale Elec. Co-op.*, 254 N.W.2d 234, 240 (Wis. 1977) ("[T]he fact that the full extent of the damages is a matter of uncertainty by reason of the nature of the tort is not a ground for refusing damages."). The problem here is that the lack of better evidence in this case is not due to a lack of adequate records, *Metropolitan Sewerage*, 255 N.W.2d at 299, or the "nature of the tort," *Cutler Cranberry*, 254 N.W.2d at 240, but to Banjo Buddies' failure to introduce more reliable evidence, either by introducing Renosky's invoices for the remaining 89 components or substantiating the undated National Media quote through questioning at trial. As the court explained in *Cutler Cranberry*, the rule permitting estimated damages in the face of uncertainty as to the amount of damages "has been sustained where, *from the nature of the case,* the extent of injury and the amount of damage are not capable of exact and

law. That is, by the time Banjo Buddies realized the importance of the document, it was too late to flesh it out on the stand.

23

accurate proof." *Id.* (emphasis added) (internal citation omitted).

Banjo Buddies attempts to lay the blame for its failure to introduce better evidence on Renosky. Banjo Buddies contends that Renosky failed to provide discovery "in a timely manner," and did not produce "any invoices or other information on costs until two business days before trial." However, Banjo Buddies never claims that Renosky ultimately failed to produce those documents. Further, if Banjo Buddies felt that Renosky had not complied (or not timely complied) with its discovery requests, it should have pursued relief under the discovery rules or sought a continuance. Banjo Buddies cannot reasonably claim that its burden of proof should be lowered because it did not have time to sift through the boxes of documents Renosky allegedly produced on the eve of trial. Furthermore, as noted above, *see supra* n.11, Banjo Buddies' failure to substantiate the National Media quote cannot be attributed to Renosky's foot-dragging during discovery.

## IV. Conclusion

For the reasons given above, we will affirm the District Court's award of Renosky's estimated profits on the Bionic Minnow project but reverse the District Court's decision to add Renosky's shareholder distributions to that amount. We will affirm the District Court's judgment in all other respects.