**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3893
_____

COVERTECH FABRICATING, INC.

v.

TVM BUILDING PRODUCTS, INC.;
TVM CANADA, INC.

TVM Building Products, Inc.,
                                    Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 3-13-cv-00150)
Honorable Kim R. Gibson, District Judge
_____

Argued: September 21, 2016

Before: JORDAN, VANASKIE, and KRAUSE, *Circuit Judges*

(Opinion Filed: April 18, 2017)

Brian W. Shaffer, Esq. **[ARGUED]**
Andrew C. Whitney, Esq.
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

*Attorney for Plaintiff-Appellee*

J. Michael Baggett, Esq. **[ARGUED]**
McCann Garland Ridal & Burke
Suite 1030
11 Stanwix Street
Pittsburgh, PA 15222

*Attorney for Defendant-Appellant*

_____

OPINION OF THE COURT
_____

KRAUSE, Circuit Judge.

Too often the silence of contracting parties must be filled by the voice of the courts. Such is the case here, where we are called upon to resolve a trademark dispute in which no written contract designates ownership, and, in the process, to clarify the paradigm through which common law ownership of an unregistered trademark is determined when the initial sale of goods bearing the mark is between a manufacturer and its exclusive distributor. The District Court in this case awarded ownership to the manufacturer, but did so on the basis of the first use test, and found the distributor liable for

infringement and fraud before rejecting its defense of acquiescence and awarding damages under the Lanham Act. Because the District Court failed to recognize and apply the rebuttable presumption of manufacturer ownership that we conclude pertains where priority of ownership is not otherwise established, and because the District Court incorrectly relied on gross sales unadjusted to reflect sales of infringing products to calculate damages, we will affirm on alternative grounds as to ownership, will affirm as to fraud and acquiescence, and will vacate and remand as to damages.

## I.      Factual Background and Procedural History

Covertech Fabricating, Inc. is a manufacturer of protective packaging and reflective insulation located in Toronto, Canada.  Since 1998, it has sold numerous reflective insulation products under the umbrella of its lucrative rFOIL brand—a United States trademark that has been registered in Covertech's name since 2001.  The rFOIL brand comprises the following products: ULTRA NT RADIANT BARRIER ("ULTRA"), NT RADIANT BARRIER, CONCRETE BARRIER FOIL, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD.  CONCRETE BARRIER, like the umbrella rFOIL brand, is a registered United States trademark.

TVM Building Products, Inc. is a distributor of specialty building materials operating out of Johnstown, Pennsylvania.  In 1998, the President of TVM, Michael Boulding, and the owner and President of Covertech, Furio Orologio, entered into a verbal agreement (the "exclusive distribution agreement"), which designated TVM as the exclusive marketer and distributor of Covertech's rFOIL insulation products in the United States.  Under the terms of

3

the exclusive distribution agreement, Covertech sold its rFOIL products directly to TVM for resale to customers in the United States at a markup; in turn, TVM refrained from selling competitor products in the United States. TVM held exclusive responsibility for customer service and marketing of Covertech products in the United States, and while Covertech reviewed and approved advertising materials designed by TVM, it otherwise played no role in marketing, sales, or customer service.

In October 2007, Covertech terminated the exclusive distribution agreement, both because TVM was consistently struggling to remit timely payment and because Covertech discovered TVM had been purchasing comparable product from another manufacturer, Reflectix, and passing off some of its merchandise as Covertech's. At the time, TVM assured Covertech that its labeling indiscretions were isolated incidents caused by errors in filling its orders. In late 2007 or early 2008, the parties entered a new agreement (the "private label agreement") pursuant to which Covertech manufactured products for TVM to sell under its own TVM brand name, and Covertech also continued to sell certain rFOIL products to TVM for resale to customers using Covertech's product names. Under this agreement, TVM represented that it would refrain from buying products from Covertech's competitors.

Despite TVM's promise, it purchased over $2.2 million in reflective insulation products from Reflectix between 2006 and 2009, and in 2009 it began to purchase comparable goods from another competitor, Soprema. In late 2010 or early 2011, shortly after Covertech learned of TVM's illicit purchases, the parties terminated their relationship entirely, including the private label agreement, and Covertech

4

proceeded to sell its own products directly in the United States.

Nonetheless, TVM, without authorization from or consultation with Covertech, continued to market its reflective insulation products using the rFOIL brand names. For example, in 2011, TVM advertised using the CONCRETE BARRIER, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD brands in its own product catalog, and between 2009 and 2013, TVM marketed non-Covertech products on its website using the rFOIL, CONCRETE BARRIER, CONCRETE UNDERPAD, and ULTRA CONCRETE UNDERPAD labels. At no point did Covertech give TVM permission to sell merchandise using these product names, and on multiple occasions when Covertech was alerted to particular instances of such unauthorized sales during this period, Covertech confronted TVM in phone calls and demanded that it discontinue this practice.

Over the years that Covertech engaged TVM as its distributor and made efforts, short of court action, to persuade TVM to stop using rFOIL brand names in its advertising, Covertech also took steps to protect its ownership of the mark in Canada and the United States. Specifically, in 2009, Covertech filed a petition to register ULTRA as a trademark with the Canadian Intellectual Property Office ("CIPO"), which registered the mark in 2010. The next year, although Covertech had informed TVM of its registration in Canada, TVM—without notice to or permission from Covertech— petitioned the United States Patent and Trademark Office ("PTO") to register ULTRA as a trademark in its name. Once it learned that the PTO granted that petition, Covertech filed an adverse petition with the PTO seeking registration of

5

ULTRA in its own name and filed the lawsuit in federal court against TVM that gives rise to this appeal.[1]

After a one-week bench trial, the District Court granted judgment in favor of Covertech on all claims and, as relevant to this appeal, calculated TVM's ill-gained profits of $4,054,319 and alternative statutory damages of $4 million for TVM's infringement of the rFOIL and CONCRETE BARRIER marks. *See* 15 U.S.C. § 1117(a), (c). Because Covertech elected to receive the profit calculation, judgment in its favor was awarded in that amount for the infringement of those marks. The District Court subsequently denied TVM's omnibus motion for amended and additional findings, altered and amended judgment, and a new trial, and awarded Covertech attorneys' fees and expenses. This appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, and 1367, and we have jurisdiction

---

[1] The original action, which was filed in the Middle District of Pennsylvania, also named TVM Canada, Inc., but Covertech later stipulated to dismissal of TVM Canada, Inc. and to the transfer of the action to the Western District of Pennsylvania. The PTO has stayed the adverse petition proceeding pending resolution of the federal court litigation.

6

pursuant to 28 U.S.C. § 1291.[2] We review a district court's factual findings following a bench trial for clear error, affording "due regard to the trial court's opportunity to judge the witnesses' credibility." *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 514-15 (3d Cir. 2012) (quoting Fed. R. Civ. P. 52(a)(6)); *see also United States v. Mallory*, 765 F.3d 373, 381-82 (3d Cir. 2014). In contrast, we review conclusions of law, including "choice and interpretation of legal precepts," *de novo*, *Post*, 691 F.3d at 515, and an award of profits under the Lanham Act for abuse of discretion, *see Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 173 (3d Cir. 2005).

## III. Discussion

TVM raises four issues on appeal. First, it contends that the District Court erred in determining that Covertech, not TVM, is the owner of the ULTRA trademark. Second, TVM challenges the District Court's holding that TVM committed fraud on the PTO in applying to register the ULTRA trademark in its name. Third, TVM asserts that the District Court erred in rejecting TVM's affirmative defenses of acquiescence and laches. Finally, TVM argues that the

---

[2] We reject Covertech's suggestion that TVM lacks standing due to the sale of TVM's assets to a secured creditor after entry of final judgment by the District Court. Regardless of whether TVM would benefit from reversal of the District Court's cancellation of the ULTRA mark, TVM retains liability for damages from its infringement of that mark and hence continues to hold a live interest in this controversy. *See generally Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016).

7

District Court abused its discretion in awarding $4,054,319 in damages to Covertech for TVM's infringement of the CONCRETE BARRIER and rFOIL marks. We address these issues in turn.

## A. Ownership

In assessing the rightful ownership of the ULTRA mark, the District Court relied on the "first use test," which determines initial ownership by asking which party was the first to use an unregistered trademark in commerce. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100 (1918); *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991). The District Court applied that test to the record developed over five days of trial to conclude that Covertech was the rightful owner. For the reasons below, we conclude (1) the first use test was not the correct test given the unique context of the manufacturer-distributor relationship, and (2) the District Court should nonetheless be affirmed because ownership still goes to Covertech when the correct test is applied.

### 1. The First Use Test v. The McCarthy Test

The first use test is generally proper for unregistered trademarks, taking account of the well-established common law principle of "first-in-time, first-in-right" that rewards actual and continuous use in commerce as between market competitors. *See Ford Motor Co.*, 930 F.2d at 292; 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 16.1 (4th ed. 2017). This paradigm is an imperfect fit, however, when it comes to the often exclusive and noncompetitive manufacturer-distributor relationship,

where ownership rights would inure to the benefit of the distributor in a multitude of cases based simply on the fact that the distributor, albeit at the manufacturer's direction, made the initial sale of goods bearing the mark to the public.

In contrast to a single actor's entry into the market, manufacturers and distributors typically engage in concerted action and thus may, at the outset of the relationship, make any number of arrangements for the handling of the mark. In some cases, the parties' distribution agreement may make express provision for ownership of the mark in either party. *See Premier Dental Prod. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 854 (3d Cir. 1986). In other cases, there may be an express assignment of ownership—that is, the sale of a mark—passing the assignor's rights in the mark to the assignee. *See Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 821-22 (3d Cir. 2006); 2 *McCarthy on Trademarks* § 18:1. In still other manufacturer-distributor relationships, the contracting parties may omit to make explicit provision for ownership of a mark, but even so, have no expectation that a manufacturer, merely by contracting with a distributor, thereby relinquishes its ownership rights in favor of the distributor. To presume that in every case where ownership is not decided in advance, a distributor who makes the initial public sale thereby assumes the mark and the manufacturer cedes any claim to initial ownership would defy logic and common sense. Thus, it cannot be that, in the absence of a contractual arrangement, the first use test automatically fills that gap. Instead, a different test accounting for the realities of the manufacturer-distributor relationship must control.

For that reason, when we first considered the manufacturer-distributor domain in *Doebler*, we cited approvingly the ownership test expounded by Professor J.

9

Thomas McCarthy in his seminal treatise on trademark law. *Doebler*, 442 F.3d at 826 (quoting 2 *McCarthy on Trademarks* § 16:48). But we had no need in *Doebler* to expressly adopt that test because, in that case, initial ownership as between the manufacturer and distributor was clearly established. *Id.* at 826-27. Today, the issue is squarely presented to us, and we find the McCarthy test has much to recommend it.

As Professor McCarthy explains, where initial ownership between a manufacturer and its exclusive distributor is at issue and no contract exists, the manufacturer is the presumptive trademark owner unless the distributor rebuts that presumption using a multi-factor balancing test designed to examine the distribution agreement in effect between the parties. 2 *McCarthy on Trademarks* § 16.48; *see also* 5 *McCarthy on Trademarks* § 29.8. The six factors that should be considered are: (1) "[w]hich party invented or created the mark"; (2) "[w]hich party first affixed the mark to goods sold"; (3) "[w]hich party's name appeared on packaging and promotional materials in conjunction with the mark"; (4) "[w]hich party exercised control over the nature and quality of goods on which the mark appeared"; (5) "[t]o which party did customers look as standing behind the goods, *e.g.*, which party received complaints for defects and made appropriate replacement or refund"; and (6) "[w]hich party paid for advertising and promotion of the trademarked product." *Doebler*, 442 F.3d at 826 (quoting 2 *McCarthy on Trademarks* § 16:48).

The presumption and rebuttal factors of the McCarthy test place a thumb on the ownership scale in favor of the manufacturer, but invite courts to consider various indicia of ownership designed to elicit the roles and responsibilities of

10

the parties and the expectations of consumers in order to gauge whether, in a given case, the distributor and not the manufacturer operated as the rightful owner of the contested mark. Thus, unlike the first use test, this approach allows courts to undertake a thorough, individualized analysis of each case that accounts for the unique attributes of the manufacturer-distributor relationship.

We are persuaded by Professor McCarthy's approach, and hold today that as between a manufacturer and its exclusive distributor, there is a rebuttable presumption of initial trademark ownership in favor of the manufacturer, and that Professor McCarthy's test is the proper analytical tool through which a distributor may attempt to rebut that presumption in the absence of a contractual agreement.

Our adoption of this test is also consistent with our sister Circuits, which, when asked to determine ownership in this context, have endorsed some version of the McCarthy test, *see TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 n.4 (7th Cir. 1997); *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996), as have a number of district courts, *see, e.g.*, *Prod. Source Int'l, LLC v. Nahshin*, 112 F. Supp. 3d 383, 395-97 (E.D. Va. 2015); *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 403 (S.D.N.Y. 2011), *aff'd*, 462 F. App'x 31, 33 (2d Cir. 2012); *Ilapak Research & Dev. S.A. v. Record SpA.*, 762 F. Supp. 1318, 1322 (N.D. Ill. 1991). While some courts have distilled Professor McCarthy's six factors to four, *see Sengoku*, 96 F.3d at 1220; *Tecnimed*, 763 F. Supp. 2d at 403, and others have varied the language*, see, e.g.*, *Ilapak*, 762 F. Supp. at 1322, all have cited either to Professor McCarthy's treatise

itself or to cases that do so, applying the McCarthy test with only minor variations across the federal courts.[3]

Despite its general acceptance and although our own adoption of it today was presaged by *Doebler*, the McCarthy test is absent from the District Court's analysis of the ULTRA mark in this case. Nor, apparently, did the parties recognize its relevance, as it garnered nary a mention in their briefing before the District Court or on appeal. Instead, the District Court and the parties relied on *Premier Dental Products. Co. v. Darby Dental Supply Co.*, 794 F.2d 850 (3d Cir. 1986), where we counseled consideration of a product's goodwill before finding that ownership has vested in a distributor, even when the manufacturer has expressly assigned title to the mark. *See id.* at 853-54. In *Doebler*, however, we cabined *Premier* to only those cases involving express assignment of a mark. *Doebler*, 442 F.3d at 826-27 & n.16. Yet the case before us, all parties agree, falls outside that category.

After we asked the parties to address *Doebler* in supplemental submissions and at argument, TVM conceded the District Court's error and the applicability of the McCarthy test and urged that it should prevail when that test is applied; Covertech, however, sought to defend the District Court's decision in its favor, including the District Court's

---

[3] In reducing McCarthy's six factors to four, the Ninth Circuit in *Sengoku* combined as one factor the first and second factors—asking "which party invented and first affixed the mark onto the product"—and omitted the sixth factor, which party paid for marketing. *See Sengoku*, 96 F.3d at 1220. We conclude, however, that district courts' analysis and appellate review will be facilitated by considering each of these factors distinctly.

12

application of the first use test.[4]  In support, though, Covertech merely directed us to *Ford Motor Co.*, our case adopting the first use test, without explaining why that test, rather than the McCarthy test, should apply here.  *See Ford Motor Co.*, 930 F.2d at 292.

We conclude the District Court's application of the first use test was legal error.  To the extent there was any ambiguity after *Doebler*, we resolve it today: In the absence of a contractual arrangement or assignment, the McCarthy test is the proper test to apply to determine ownership in the manufacturer-distributor context.

## 2.  Applying The McCarthy Test

Where a district court has applied the incorrect legal test to make the ruling under review, we may remand for that court to apply the right test in the first instance.  *See, e.g., Forestal Guarani S.A. v. Daros Int'l, Inc.*, 613 F.3d 395, 401 (3d Cir. 2010).  Here, however, the six factors of the McCarthy test are fully briefed, the parties have confirmed that they would not add to the record on remand, and our application of the test may provide helpful guidance to district courts.  We therefore proceed to apply the test ourselves,

_____

[4] Covertech also contends that we should not determine the applicability of the McCarthy test in this case given TVM's failure to raise it before the District Court and in its opening brief on appeal. We disagree. Notwithstanding TVM's waiver, it is necessary and appropriate for us to take up the question of the proper legal test because it is a purely legal question, the resolution of which is in the public interest. *See Huber v. Taylor*, 469 F.3d 67, 74-75 (3d Cir. 2006).

evaluating each of the six factors and concluding that, on balance, they favor Covertech. *See Wallach v. Eaton Corp.*, 837 F.3d 356, 374-75 (3d Cir. 2016).

First, we query which party invented or created the mark. Although it did so in the context of its first use analysis, the District Court made a finding that "Covertech developed and used the ULTRA . . . brand." App. 11. We review that finding for clear error, and see none. *See Post*, 691 F.3d at 514. The District Court's finding is supported by the testimony of Covertech's Vice President, Jonathan Starr, who explained that Covertech developed ULTRA as a "heavier-duty product" that "evolved" from its original NT RADIANT BARRIER product line. App. 862, 886, 902. Conversely, TVM contends that the testimony of its President, Michael Boulding, supports TVM's invention of the mark, *i.e.*, Boulding's statements that TVM encouraged the production of a new insulation product and fashioned the ULTRA nomenclature that followed. But, in doing so, TVM ignores the fact that the District Court judged Boulding to be incredible. We will not disturb the District Court's credibility determination—"quintessentially the province of the trial court, not the appellate court"—except in "rare circumstances," not present here, *Scully v. US WATS, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001), such as when "specific evidence" exists showing "the Court's findings were made in clear error," *Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Fund, v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) (internal quotation marks omitted). Thus, far from rebutting Covertech's ownership, this factor supports it.

Second, regarding which party first affixed the mark to the goods sold, although TVM asserts that "[t]he record does not adequately reflect the labeling of the ULTRA . . . product

14

prior to the expiration of the exclusivity agreement," Appellant's Suppl. Br. 4, the record unequivocally demonstrates that labeling was handled by Covertech. Peter Clarke, a sales representative of Covertech and a former employee of TVM, testified that during the period of the exclusive distribution agreement, Covertech factory employees used a label chart to guide them when affixing labels to manufactured products. The District Court deemed that testimony credible, and we, of course, defer to such credibility findings absent clear error. *See Trs. of the Nat'l Elevator Indus. Pension,* 332 F.3d at 194. Even Boulding conceded that TVM "would provide the artwork to Covertech in a form that they could then print the labels in order to adhere them to the product." App. 1102. In sum, this factor too favors Covertech.

The third factor, which party's name appeared on packaging and promotional materials in conjunction with the mark, is more equivocal. The record reveals examples of promotional materials that display both the Covertech and the TVM logos in connection with advertisement of the ULTRA mark and associated products, and while TVM's name is consistently larger and more prominently visible, Covertech's is associated with warranties. Because we are unable to discern any relative significance in their manner of display, this factor is in equipoise.

As to the fourth factor, which party exercised control over the nature and quality of the goods on which the mark appeared, although there is evidence on both sides, we conclude the evidence again tips in Covertech's favor. The District Court found that Covertech manufactured all products contested in this suit, and that TVM fielded complaints and supplied technical support to customers, and the parties do

15

not dispute that Covertech bore responsibility for warranties and manufactured the ULTRA product. While Boulding offered testimony that TVM monitored and set in motion the modification of goods that later became associated with the ULTRA mark, we accord little weight to that testimony in view of the District Court's general credibility findings as to that witness. *See Trs. of the Nat'l Elevator Indus. Pension,* 332 F.3d at 194. TVM's rebuttal garners no support from this factor.

TVM fares no better with the fifth factor, *i.e.*, to which party did customers look as standing behind the goods—for example, which party received complaints for defects and made appropriate replacements or refunds. Although the District Court's findings and the record reflect TVM's high-visibility roles in marketing, sales, and fielding customer complaints, it is undisputed that Covertech provided the warranties for ULTRA products and that this was made plain in product advertisements. In addition, Covertech presented customer testimony, found credible by the District Court, that reflected the ULTRA products were associated with Covertech. This factor thus supports Covertech's ownership.

The sixth and last factor—which party paid for advertising and promotion of the trademarked product—as it turns out, is the only one that favors TVM. It is undisputed that TVM was responsible for advertising and promoting the products for sale in the United States, including ULTRA, and the District Court found that TVM "was compensated by being the exclusive distributor of the product line and getting Covertech's products at a very good price, which it would then mark up for sale in the United States." App. 16. Although Covertech contends these discounts were

16

tantamount to its own payment and responsibility for advertising, that contention finds no support in the record.

Having reviewed all six factors, we conclude the presumption is dispositive, as the weight of the McCarthy factors is indisputably in Covertech's favor. While a mere counting of the factors is not dispositive—the weight of each being variable with the facts—the numbers here, as well as the weight, favor Covertech. Factors one, two, four, and five are for Covertech; factor three is inconclusive; and factor six is for TVM. Even if the balance was in equilibrium, such a result would still be insufficient to overcome Covertech's presumptive ownership of the ULTRA mark. The District Court's conclusion that Covertech was the rightful owner of the mark, albeit under an incorrect test, was thus correct, and we will affirm as to that ruling.

## B.     Fraud on The PTO

In addition to ownership of the mark, TVM challenges the District Court's cancellation of TVM's registration of the mark based on a finding of fraud on the PTO, specifically, its finding that Boulding made intentional misrepresentations in TVM's application to register the ULTRA trademark and its legal conclusion that TVM committed fraud. These challenges lack merit.

The Lanham Act provides that a third party may petition for cancellation of a registered trademark if the registration was procured by fraud, 15 U.S.C. §§ 1064(3), 1120, a showing that must be made by clear and convincing evidence that the "applicant or registrant knowingly ma[de] a false, material representation with the intent to deceive the PTO," *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir.

17

2009); *see Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir. 2001). That intent to deceive can be inferred from indirect or circumstantial evidence, *In re Bose Corp.*, 580 F.3d at 1245, indicating that "the registrant actually knew or believed that someone else had a right to the mark," *Marshak*, 240 F.3d at 196.

Here, Boulding attested in connection with TVM's petition to register the ULTRA mark that "he believed no other person, firm, corporation, or association ha[d] the right to use the mark," a statement he made under penalty of perjury.[5] App. 1451. The District Court was entirely justified in finding Boulding's testimony at trial not credible and in concluding that, "[i]n light of Mr. Boulding's prior interactions with Covertech, he must have known or believed that Covertech had a right to use the mark." App. 98-99. While Boulding asserted his statement was a mere mistake, the District Court astutely observed, first, that TVM was aware on the date of its PTO application that Covertech had recently registered the ULTRA mark in Canada, and second, that Covertech continued to sell ULTRA in the United States

---

[5] The District Court found not only that statement, but also two additional statements Boulding made in applying to the PTO, to be intentional misrepresentations—(1) "TVM first used the mark in 2006" and (2) Boulding "believed that TVM was the owner of the mark." App. 97. We need not address knowledge or falsity as to these statements because we will affirm the District Court's conclusion as to the statement above, which alone supports the conclusion that TVM's registration was fraudulently procured and thus should be cancelled.

18

at that time, placing the companies in direct competition. Deferring to the District Court's credibility findings, which are fully supported by the record, we perceive no error in the District Court's determination that Boulding subjectively intended to deceive the PTO, *see In re Bose Corp.*, 580 F.3d at 1245; *Marshak*, 240 F.3d at 196, and that TVM obtained registration of the ULTRA mark through fraud.

## C.    Acquiescence

We turn next to TVM's argument that the District Court should have found Covertech's claims barred by the doctrines of laches and acquiescence. We dispose quickly of the laches argument, which was raised for the first time on appeal and is therefore waived. TVM's acquiescence argument is preserved for appeal, but is nonetheless unavailing.

An alleged infringer may assert the equitable defense of acquiescence "when the trademark owner, by affirmative word or deed, conveys its implied consent" to the use of a mark. *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998). Relevant considerations, required as elements in a number of our sister Circuits, may include whether "(1) the senior user actively represented that it would not assert a right or a claim; (2) the [senior user's] delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 941 (7th Cir. 2016); *see also Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010); *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002); *SunAmerica*

*Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325, 1334 (11th Cir. 1996). Once use becomes infringing, the relevant date for quantifying the "delay" is when the trademark owner either knew or should have known of the existence of a provable claim of infringement, and an owner's claim does not ripen until the defendant's infringement is sufficiently far-reaching to create a likelihood of confusion. *See, e.g.*, *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Tex.*, 357 F.3d 441, 449-50 (4th Cir. 2004).

Here, these considerations lead us to conclude Covertech did not acquiesce in TVM's infringement. TVM has not identified any affirmative statement or act on the part of Covertech that expressly or impliedly authorized TVM's infringement, nor has it shown that Covertech's delay in initiating suit was either inexcusable or unduly prejudicial. *See Hyson*, 821 F.3d at 941; *Pappan*, 143 F.3d at 804. Although Covertech learned on at least three occasions in 2007 and 2008 that TVM was passing off other manufacturer's goods under its brand names, TVM led it to believe these incidents were isolated and merely accidental, and Covertech did not discover until late 2010 or early 2011—in a deposition for an unrelated matter—the true magnitude of TVM's infringement. Only then did the acquiescence clock start to run, and Covertech's escalating responses from that point forward appear both reasonable and timely. That is, having discovered TVM's actual infringement, Starr called Boulding on multiple occasions between 2010 and 2013 to demand that TVM "stop using . . . [Covertech's] brand names." App. 935. And when those efforts failed to yield results, Covertech commenced this litigation in May 2013. On that record, we perceive no factual or legal error in the District Court's conclusion that

20

Covertech's delay in initiating suit did not demonstrate implied consent. *See Pappan*, 143 F.3d at 804.

### D. Damages

In its final argument on appeal, TVM submits that the District Court abused its discretion in awarding to Covertech $4,054,319 of TVM's profits for TVM's infringement of the rFOIL and CONCRETE BARRIER trademarks because, in the absence of any evidence in the record of TVM's actual profits for sales of infringing products, the District Court based its calculation on TVM's total sales in the metal building industry. That is, rather than awarding $4 million in statutory damages, the District Court relied on evidence of TVM's gross sales between 2009 and 2013 and then spontaneously reduced this figure by 30% to avoid an excessive award. If the finding of infringement is upheld on appeal, TVM contends the proper award would be statutory damages.[6] We agree.

The Lanham Act provides two alternatives for calculating damages: either an award subject to principles of equity that turns on evidence of the defendant's sales and profits, *see* 15 U.S.C. § 1117(a), or, alternatively, statutory damages of between $1,000 and $2 million per counterfeit mark for each type of good or service offered for sale or distributed, as the court considers just, *see id.* § 1117(c). The choice between these awards is at the plaintiff's election, and

---

[6] While in briefing, TVM appeared to assert error in the District Court's calculation of both actual and statutory damages, at oral argument, it clarified that it contests only actual damages, not the District Court's alternative calculation of $4 million in statutory damages.

the district court enjoys wide discretion in applying equitable principles. *See id.*; *Banjo Buddies*, 399 F.3d at 177. But, in particular where a district court is making an estimate of actual profits under the first alternative, its discretion must be within boundaries, and the touchstone is reasonableness. Those boundaries were tested here and, we conclude, were crossed when the District Court calculated damages by using industry-wide gross sales figures and by selecting a random discount value to determine—in the absence of, for example, company records, expert testimony, or other record evidence—that profits approximated 70% of gross sales of all industry products.

Covertech, relying on our decision in *Banjo Buddies v. Renosky*, 399 F.3d 168 (3d Cir. 2005), contends the District Court's calculation was within its discretion in view of the Lanham Act's burden-shifting framework for an equitable award of actual damages. Under that framework, the trademark owner is tasked with proving the infringer's sales before the burden of proof shifts to the defendant to show costs and deductions. *See* 15 U.S.C. § 1117(a). Covertech's argument seems to be that if a plaintiff makes a showing of gross sales—even industry-wide sales, not limited to the infringing product—and a defendant then fails to offer a rebuttal, it is within the district court's discretion to award as "actual profits" any dollar amount up to 100% of those gross sales. Covertech is mistaken.

A district court's discretion, wide as it may be, is not unbounded, and a bare showing of gross sales is not sufficient to fashion an equitable award without some anchor in the record to support a reasonable estimation of actual profits. Indeed, Covertech's approach would render equitable considerations—and by extension, our review for abuse of

discretion—a nullity. We will not interpret the Lanham Act's statutory burden-shifting mechanism in such a nonsensical manner. *See In re Kaiser Aluminum Corp.*, 456 F.3d 328, 330 (3d Cir. 2006).

Nor does our case law go so far. In *Banjo Buddies*, while we explained that a district court has broad discretion to fashion remedies where a defendant fails to meet its burden of proof regarding costs and damages, we affirmed the district court's decision to rely *sua sponte* on testimony of the defendant's business manager to estimate profits. 399 F.3d at 177. Further, in *Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56 (1st Cir. 2008), and *WMS Gaming Inc. v. WPC Productions Ltd.*, 542 F.3d 601 (7th Cir. 2008), although the respective defendants offered no evidence to mitigate the plaintiffs' showing of gross sales, those Courts of Appeals held that the damages requested were reasonable because, in each case, gross sales were tied directly to total profits resulting from infringement and the damages sought were only a small proportion of that amount. *Venture Tape*, 540 F.3d at 64; *WMS Gaming*, 542 F.3d at 604, 609.

As these cases make clear, where a district court endeavors to calculate damages under the Lanham Act on the basis of the defendant's actual profits, rather than awarding statutory damages, it must ground its estimate in the record— *e.g.*, business records, credible witness testimony, expert testimony, or industry data—in order to pass muster as a reasonable estimate and an appropriate exercise of discretion. Conversely, where the court lacks a sound basis for extrapolating actual profits, it abuses its discretion by resorting to guesswork. For just such situations, the Lanham Act provides for statutory damages in the alternative, and it is

23

on that provision that the court must rely. *See* 15 U.S.C. § 1117(c).

Here, the District Court eschewed statutory damages and awarded $4,054,319 as a matter of equitable discretion even though the record was insufficient to approximate actual damages. For the reasons we have explained, that award constituted an abuse of discretion and cannot stand. As Covertech has requested the opportunity on remand to elect an award of statutory damages*, see, e.g.*, *Cotter v. Christus Gardens*, *Inc.*, No. 99-5996, 2000 WL 187698, at *6 (6th Cir. Dec. 12, 2000); *Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir. 1983) (per curiam), we will vacate and remand with instructions to the District Court to grant that request.

## IV.    Conclusion

For the foregoing reasons, we will affirm in part and will vacate and remand to the District Court for further proceedings consistent with this opinion.